THE DELAWARE STATE FIRE AND MARINE INSURANCE COMPANY *v.* WILLIAM T. CROASDALE.

What is a libel is a question of law simply and is anything written or printed, or expressed by sign, caricatures or pictures against a natural person, or artificial body, or corporation, imputing to him or it something which has a tendency to injure his or its reputation, disgrace or degrade him or it in society, lower him or it in the opinion of the world, or bring him or it into public hatred, contempt or ridicule, if it is done maliciously, is a libel.

The publication of a libel is giving it circulation, and this is done as well by composing or writing it that it may be published, if publication follows, as by circulating it afterwards.

Where it clearly appears in evidence that a series of editorial articles alleged to be libellous were written for publication in the editorial department or columns of a daily newspaper, and were so published in it from time to

Delaware F. & M. Ins. Co. v. Croasdale.

time, but no direct evidence can be produced to prove who wrote them, the Court will in an action against the editor-in-chief of it and who generally wrote the editorials published in it for writing them, leave it to the jury to determine from all the proof in the case whether he wrote them.

The owner or controller of a printing press has no more right to print or publish a libel than any one else, nor is he under any obligation to the public that the law recognizes, to publish current or common reports for the information and protection of persons interested in anything.

But if the publication be true, the truth of it may be pleaded in justification of it, both in a civil action and on an indictment for it as a libel, if it was published without any malicious or mischievous motive; but otherwise the truth of it will not justify it.

THIS was an action on the case for libel by The Delaware State Fire and Marine Insurance Company, incorporated by the legislature of this State, against William T. Croasdale, published in several editorial articles, on different days, in the columns of the *Every Evening* newspaper in the city of Wilmington, of which he was the principal or chief editor at the time of their publication. So much of them as was declared on and alleged to constitute the libel in the narr. were as follows:

" The company is a fraud without a redeeming feature, such as would be driven out of any State having proper and well enforced insurance laws." In the paper of May 12, 1877.

" It is a rotten and worthless fraud, and we warn the people of Delaware that any money they are foolish enough to pay, will go into the pockets of a pair of rascals, who ought to be in jail. We cannot permit it to go on swindling people without warning, and we caution the public that so far from withdrawing our denunciation of the concern as a fraud run by swindlers, we know by this time that it is worse than we suspected." In the paper of October 5, 1877.

## " THE WILD CAT COMPANY."

" The insurance journals on *Every Evening's* exposure of The Delaware State Fire and Marine."

" The insurance journals which make the study of the character and condition of companies their specialty, did not need to be informed of the rottenness of the Delaware State Fire and

Delaware F. & M. Ins. Co. *v.* Croasdale.

Marine Insurance Company by a daily paper. They know a wild cat company when they see it, and denounced this affair of Myers' without waiting for a special investigation. They are thoroughly delighted, of course, with *Every Evening's* exposure of the rascally affair, however, and appear to think that it will be sufficient to immediately kill the concern, and prevent any more deluded people from doing business with it. We suppose this is in a large degree true, but we fear that some foolish people will still be gulled into wasting their money by insuring in a concern which itself needs insuring worse than the most tinder box building in the whole city.

" The following comments by prominent insurance journals will be found interesting." In the paper of December 11, 1878.

## " A Very Thin Coat of Whitewash."

" They (meaning a certain Thomas Darlington, Joseph L. Carpenter, Jr., Gregg Chandler and Samuel Murphey) have allowed themselves to be made mere whitewashers who spread the thin coat of their own credulity over a rotten fraud. They will, in the eyes of thoughtful people, be morally responsible for any loss into which the respect for their names may lead any ignorant and inexperienced person who does not see through the report they have made." In the paper of January 3, 1879.

" We do not know that it is worth while to take any trouble for the benefit of honest people so utterly foolish as to have anything to do with such a concern as the Delaware State Fire and Marine, but if any such people have any friends, we advise them to look into the provisions of the rascally bill which has now stuck in the Senate for a time, and which Bright, after getting Myers to coach him, is now lobbying for. How much longer is it going to take to make the people of this State comprehend just what sort of man this Bright is? How much longer does Rev. Dr. Caldwell purpose to stand up before this community as a preacher of righteousness with such a man a member in good standing in his church? " In the paper of February 25, 1879.

The pleas were the general issue, not guilty, and several

Delaware F. & M. Ins. Co. *v.* Croasdale.

special pleas of justification, that the publications were true, that the allegations contained in them were then matters of general rumor and report, and were fit matters for publication in the newspapers for the information and protection of the public in such a case.

The trial was a protracted one and numerous witnesses were examined in it, but the material facts involved and proved in it, will sufficiently appear from the charge of the court in submitting it to the jury.

Although it was proved and admitted that the defendant was the editor-in-chief of the *Every Evening* at the time of the several publications, there was no direct proof that he was the author of them or any of them, and when called as a witness to the stand by counsel for the plaintiff to prove that he was the author of them, he declined to answer the question, because he was not bound to criminate himself, if he should afterwards be indicted for it, and was, on that ground, excused by the Court. And in the absence of such direct proof, when the counsel for the plaintiff had closed the examination of their witnesses in the case,

*Bird,* for the defendant, made a motion for a non-suit, on the ground that the plaintiff had wholly failed to prove, as he was bound to do under the first issue joined in the action, that the defendant was the author of the articles in question.

*Lore,* for the plaintiff: The Court would observe that they had proved by Mr. Bell, who was connected with the *Every Evening,* and the publication of it, that the defendant was the editor-in-chief of it, as he termed him, and that the editorials in it were in general written by the defendant, although sometimes editorials in it were written by himself and by Mr. Humphries, but they further proved by him, and also by Mr. Humphries, that neither of them wrote either of the editorials in question; and was not that sufficient evidence to go to the jury that the defendant wrote them and had them published in the paper of which he was the chief editor, and for which he generally wrote the editorials?

Deleware F. & M. Ins. Co. *v.* Croasdale.

*The Court* so considered, and refused the motion for a non-suit.

*Lore* (*Whiteley* with him), for the plaintiff: A libel in law is a publication made with malice injurious to the character and credit of the party libeled, whether a natural or an artificial person, or a corporation, and in this case it was self-evident that the language of the libel was full of the bitterest malice and venom. But it was not necessary in such a case as this to prove that the defendant actually wrote the libel. It had been proved and was admitted that he was the editor-in-chief of the paper, and that these libellous articles were all published as editorials in the editorial department or columns of it, and that made him, as such editor, personally responsible to the plaintiff for the publication of them. As to the first plea of the defendant, that the alleged libel was substantially true, that was not sufficient, because every plea of justification in such a case must be as broad as the charge itself, and the defendant must justify, in such a special plea, the charge as he has made it. 9 E. C. L. Rep., 295 ; 4 Dowl. *v.* Ryl., 230 ; Wend., 487 ; 20 Wend., 57 ; 24 Wend., 354 ; 12 Ver., 456 ; Towns. on Libel and Slander, § 362, note 1.

*Bird* (*Bates* with him for the defendant): What are recognized as privileged communications, or in the nature of privileged communications, are not libelous in contemplation of law, unless published with malice, nor will the law presume or imply that such a communication was published with malice, but the party alleging it will be bound to prove it. What will constitute such communications may be found well defined and classified in 2 Add. on Torts, § 1091, n. 1 ; 2 Greenl. Ev. § 418 ; 48 Ill., 89. And with respect to *quasi* public corporations which claim the confidence of the public, it had been wisely held that the free criticism of them by the public press is rather to be encouraged than condemned by the courts. 24 Wend., 434 ; 2 Phil., Ev., 950 ; 1 R. & M., 384 ; 2 Stark. Rep., 153. We have, in addition to this, a statute which provides that on the trial of an indictment for libel, the truth of the matter charged may be given

13

Delaware F. & M. Ins. Co. v. Croasdale.

in evidence, and if the jury so find, and that the act was induced by good motives and was without malicious intent, the defendant shall be acquitted; and in a civil action therefor, in which the truth is pleaded and proved, if found that it was written or published properly for public information, and with no malicious or mischievous motive, the jury may find for the defendant. Rev. Code, 654, §§ 1, 2.

*Whitely* here asked of the Court, in reply to the authorities cited on the other side upon the point made as to what were termed privileged communications, to refer to the following authorities for the well-settled principle of law that in action for libel by any party, there is no difference whether the publication of it was by the editor of a newspaper, or by any other person whatever. Towns. on Libel and Slander, §§ 481, 482; Dawson *v.* Duncan, 90 E. C. L. Rep., 229; Sheckell *v.* Jackson, 10 Cush., 26.

*The Court, Comegys,* C. J., charged the jury.

Gentlemen of the Jury :

The case which has been on trial before you for so long a time, and which I am about to deliver to you for your decision, is an action of libel brought by the Delaware State Fire and Marine Insurance Company, a corporation duly created by a law of this State, passed in that behalf, against William T. Croasdale, a citizen of Wilmington, in this county; the company being the plaintiff, and he the defendant, and, for convenience, I shall speak of them hereafter as plaintiff and defendant respectively.

Under the charter granted by the legislature (which was at the January session of 1875), the company organized itself in the usual mode by the selection of officers and opening subscription books, at Delaware City, in this county, soon afterwards, and continued to do business there until on or about the first of January, 1878, when its office was closed at that point and another opened in Wilmington, where it now is held. These facts appear by the testimony of Messrs. Money and Henry, who were

Delaware F. & M. Ins. Co. *v.* Croasdale.

sometime officers residing at Delaware City, and by William Bright, speaking as to the location of the Company's office at Wilmington. The plaintiff, it appears by the charter in evidence, had the right to transact a stock insurance business, and also a mutual insurance business—the former requiring a capital to operate with, and the latter not needing any as such, but only the obligations of its members, called premium notes, and the accrued and invested interest upon them.

Whilst the plaintiff was engaged in its business of insurance under its charter, viz., on the 12th of May, 1877, the following language, or charge, with respect to it, appeared in the *Every Evening*, a newspaper published daily in the city of Wilmington :

" The company is a fraud without a redeeming feature, such as would be driven out of any State having proper and well-enforced insurance laws."

Afterwards, on the 5th of October, of the same year, the following also appeared in the same paper :

" It is a rotten and worthless fraud, and we warn the people of Delaware that any money they are foolish enough to pay will go into the pockets of a pair of rascals who ought to be in jail."

" We cannot permit it to go on swindling people without warning, and we caution the public that so far from withdrawing our denunciation of the concern as a fraud run by swindlers, we know by this time that it is worse than we suspected."

On the 11th day of December, 1878, there appeared in the same paper the following :

" The Wild Cat Company. The Insurance Journals on *Every Evening's* Exposure of the Delaware State Fire and Marine.

" The insurance journals which make the study of the character and condition of companies their specialty, did not need to be informed of the rottenness of the Delaware State Fire and Marine Insurance Company by a daily paper. They know a wild cat company when they see it, and denounced this affair of Myers' without waiting for a special investigation. They are thoroughly delighted, of course, with *Every Evening's* exposure of the rascally affair, however, and appear to think that it will be

Delaware F. & M. Ins. Co. *v.* Croasdale.

sufficient to immediately kill the concern, and prevent any more deluded people from doing business with it. We suppose this is, in a large degree, true; but we fear that some foolish people will still be gulled into wasting their money by insuring in a concern which itself needs insuring worse than the most tinder-box building in the whole city.

" The following comments by prominent insurance journals will be found interesting."

In less than a month afterwards, viz., on the 3d of January, 1879 this language was used in the same paper:

" A very thin coat of whitewash. They (meaning a certain Thomas Darlington, Joseph L. Carpenter, Jr., Gregg Chandler, and Samuel Murphey) have allowed themselves to be made mere whitewashers, who spread the thin coat of their own credulity over a rotten fraud. They will, in the eyes of thoughtful people, be morally responsible for any loss into which the respect for their names may lead any ignorant and inexperienced person who does not see through the report they have made."

And finally, on the 25th of the following month (February, 1879) these words were published in said paper:

" We do not know that it is worth while to take any trouble for the benefit of honest people so utterly foolish as to have anything to do with such a concern as the Delaware State Fire and Marine, but if any such people have any friends we advise them to look into the provisions of the rascally bill which has now stuck in the Senate for a time, and which Bright, after getting Myers to coach him, is now lobbying for. How much longer is it going to take to make the people of this State comprehend just what sort of man this Bright is? How much longer does Rev. Dr. Caldwell purpose to stand up before this community as a preacher of righteousness with such a man a member in good standing in his church ?"

These different expressions, as they have been quoted to you from the plaintiff's declaration, are, standing by themselves, without point or application; but by means of what, in technical phrase, is called an *innuendo,* each of them is alleged to refer to the plaintiff, and it is not denied that they do not refer to it,

Delaware F. & M. Ins. Co. v. Croasdale.

and were meant to charge it with being a concern conducting its business on fraudulent principles, or with fraudulent purposes. The action is brought to recover damages for this alleged wrong. The defendant has pleaded to the charges against him in the plaintiff's declaration, five several pleas; the first of which is, that he is not guilty of the publication; the others are what are called pleas of justification, that is, he admits that he published the articles, but justifies his conduct in so doing upon four grounds: 1st. That the words "were substantially true, and that the same were published properly for public information and with no malicious, or mischievous motives." 2d. That "they were matters of common report, and that the said defendant was engaged in printing and publishing the newspaper in said declaration mentioned, and was under an obligation to the public to print and publish such common report for the information and protection of persons interested in obtaining insurance." 3d. That the "statements made in the said supposed libel at and before the printing and publishing thereof were true;" and 4th. That the "statements made in the said supposed libel at and before the printing and publishing thereof were true and the same were published properly for public information, and with no malicious or mischievous motives." To each of these pleas the plaintiff has made answer, by joining issue with him upon the plea of not guilty, and by traversing or denying the allegations of the rest, and tendering issue upon such denial—which issue, having been accepted by the defendant, the case is brought down to a few questions, which are now to be determined by your verdict, under the instruction of the court with respect to the law governing the case.

Although the defendant has, by the four different pleas of justification, admitted that the alleged libels were published by him, yet his first plea, of not guilty, denies that they were; and it is the rule that where there is a plea traversing the declaration, that is, denying all the material facts necessary to be proved by the plaintiff, every such fact must be affirmatively proved by him, and he cannot rely upon the defendant's admission in his pleas in bar, or justification, as the other pleas in this case are

intended to be. It, therefore, devolved on the plaintiff in this case to show that the expressions or language set forth in his declarations are what is known as libellous; that the defendant published them, that is, circulated them, or wrote them with a view to publication, and that they were published; that they relate to the plaintiff; and the damage occasioned by them. In order that you may be satisfied whether the plaintiff has done this or not, it is necessary that you should be instructed what a libel is, and what is libellous matter. That is a question of law simply, and you must rely upon the court for evidence of what the law is. With respect to the publication, or writing for publication, and the application of the language to the plaintiff, and also the damage sustained by it from it, you rely upon the proof before you of witnesses, except where (if a certain state of things exist) there is no need of actual proof of any damage.

Various definitions of libel are given in the books of reports of trials, as well in this State as elsewhere, and are to be found also in elementary treatises. They vary slightly in language, but they mean the same thing—that anything written, or printed, or expressed by signs, caricatures, or pictures, against a natural person, or artificial body as a corporation, imputing to him or it something which has a tendency to injure his or its reputation, disgrace or degrade him or it in society, lower him or it in the opinion of the world, or bring him or it into public hatred, contempt or ridicule—if done maliciously—is a libel. Sexton v. Harris, 3 Harr., 467. Applying this definition to the language used, as set forth in the declaration, there is no room for doubt that the words stated in all the different counts of the declaration, or divisions of it, are libellous, and if used maliciously, subject their author to liability for them by way of damages. We, therefore, assume that the plaintiff has shown that the language set forth is libellous. The next thing for him to prove was that the defendant published them. Publication of a libel is giving it circulation. This is done, as well by composing, or writing it, that it may be published, if publication follow, as by circulating it afterwards. The writer of a libellous article for publication in a newspaper or otherwise; the person, or corpora-

Delaware F. & M. Ins. Co. *v.* Croasdale.

tion which issues it to the world, and every one who afterwards circulates it, is liable, under the law, to damages to an aggrieved party—if from the facts it appear that he is entitled to recover any. In this case the allegation of the plaintiff is, that the defendant composed, or wrote, these several libellous articles for circulation through the columns of the *Every Evening* newspaper, a sheet printed in Wilmington daily, and shown by proof to have had a circulation of about four thousand a day, besides an extensive exchange with other newspapers in and out of the State, and he presents you with several witnesses to prove that fact, all of whom state that the defendant is and was at the time of their publication the editor-in-chief (as they call him) of that paper. It is shown, by their testimony, that the several articles from which the libellous language is extracted, were editorial articles, and published in the editorial columns. Although two of the three witnesses, Bell and Humphrey, testified that they occasionally contributed editorial articles to the paper in the absence of the defendant, yet each, speaking for himself, testified that he did not write those in question. They also went farther and stated that they did not know who wrote them.

In answer to the counsel for the defendant, they stated that, sometimes, other articles than those written by the editor-in-chief, the defendant, and thus occasional ones, were written by others, but they did not know who those others were. This apparently deplorable want of knowledge on the part of the witnesses above named, is explained, however, by the fact that the editorials, when written, pass into the hands of one whose duty it is to adjust or arrange them for publication in the paper; and that person is the witness, J. Harvey Young, who states that, when received, they are so arranged by him for the compositors—that is, the persons who set the type. He did not know who was the author of them; but he did know that they came into his hands by due course, to be forwarded to the type-setters and thence to the presses. It is not his duty to read the matter, and therefore it well may be that he did not peruse those libels. So that you have this important fact without dispute: that these editorials were written for publication. This usage,

Delaware F. & M. Ins. Co. v. Croasdale.

proved by Young, settles that question; for editors must be acquainted with what it is the practice to do with their effusions. Copies of the editions of the *Every Evening*, or rather numbers of the editions in which the libels were published, have been exhibited to you and proved and admitted by the defendant; the publication is therefore proved. It has also been testified before you by witnesses, examined in support of the *innuendoes* in the declaration, that the libellous words refer to the plaintiff. In support of its case therefore, under the plea of not guilty, the plaintiff presents you with this court's charge that the words in the declaration are libellous; with uncontroverted proof that they were published to the world in *Every Evening* newspaper; with the testimony of Young that editorial matter sent to him is understood to be for publication and receives it; by that of Bell and Humphrey that these publications are portions of editorial matter; and by other proof as well as theirs, that the subject of the libellous attacks was the plaintiff. One thing only is further necessary for the plaintiff to do, under the plea of not guilty, and that is, to show that the defendant wrote the editorials containing those libels. He has offered you proof upon that point, and that question is—is it, in your opinion, sufficient to fix the defendant with the authorship? If not then you must render a verdict for the defendant of not guilty and that ends the case. That proof is—that the defendant was the editor-in-chief of the *Every Evening*—that is the person who wrote the chief part of its editorial matter, and that those who occasionally wrote such matter did not compose the libels. As to the other persons who sometimes wrote, there was no verbal suggestion ventured that they wrote them. The case you are trying being a civil action we have to say to you that, in settling this question of authorship, your duty is to look at the testimony with respect to it, and weigh the fact of editorship-in-chief and composer of most of the editorial matter and the denial of the co-editors that they wrote any of them, against the statement that sometimes others wrote editorials for the *Every Evening*. If you find the former of more value than the latter, that is of greater preponderance or weight, then you may conclude that the defendant is the author of the libels;

Delaware F. & M. Ins. Co. *v.* Croasdale.

for the verdict of a jury in civil actions ought to be for the side where the greatest weight of evidence is. So concluding, the plaintiff, if there were no other plea in the case but that of not guilty, would be entitled to your verdict. The right of a plaintiff to a verdict in an action to recover damages, as this is, implies that he is entitled to recover some; but how much depends upon the proof in the case in most instances. This branch of the charge, now being delivered to you, will be treated of hereafter. We will now consider the other defences set up by the defendant.

The plaintiff's allegation is that each of these several libels was published by the defendant maliciously with intent to injure the plaintiff in its good name, fame, and credit, and bring it into public infamy and disgrace, etc., and this is contained in each of the several five counts of his declaration. To this the defendant replies generally to all the counts, the several pleas above mentioned, which confess the allegation set forth, but seek to avoid the consequences by asserting matter of defence; which the plaintiff usually denies (as has been done in this case) offering to submit the question to the arbitrament of a jury. The parties are therefore at issue not only upon the aforesaid plea of not guilty, but also upon the other defences set up by the defendant, which, to repeat, are that the words were:

1. "Substantially true, and that the same were published properly for public information, and with no malicious or mischievous motives."

2. That "they were matters of common report, and that the said defendant was engaged in printing and publishing the newspaper in said declaration mentioned, and was under an obligation to the public to print and publish such common report for the information and protection of persons interested in obtaining insurance." *

3. "That the statements made in the said supposed libel at and before the printing and publishing thereof were true."

---

* These two pleas are not valid ones, and ought to have been demurred to; but, issue having been taken upon them, we must take them, not as defences to the action, but rather as pleas in mitigation of damages.

4. " That the statements made in the said supposed libel at and before the printing and publishing thereof were true, and the same were published properly for public information, and with no malicious or mischievous motives." As each of these valid defences as the pleadings stand, is presented as an answer to all the different counts of the declaration, it follows that if the defendant has, in your opinion, succeeded in maintaining either of them, the plaintiff cannot recover, and the defendant is entitled to your verdict. That is to say, if the defendant has shown that the statements were, at and before the printing and publishing thereof, true, or that they were true, and were published properly for public information and with no malicious or mischievous motives. But this is subject to the qualification that if you should find that notwithstanding the truth of the charges (if they should appear to you to be true), yet, if the defendant was actuated in giving currency to them by a malicious motive, he is not entitled to your verdict, and you should find against him.

Although it is the law, undoubtedly, that the truth of the charges when pleaded and proved is a defence to an action like the present, yet it is not so if the motive of the publication was not a good one, but was malicious ; in which case the plaintiff would be entitled to recover, for the defendant's malice. This has always been the law, and is not altered by the Act of Assembly passed on the 4th of March, 1857, the second section of which provides, " That in actions for damages for the writing or publishing a libel, where the truth is pleaded and given in evidence, if it be found that the same was written or published properly for public information, and with no malicious and mischievous motives the jury may find for the defendant or defendants," which appears to leave the law just where it was before. If, therefore, you should find that every one of these charges is true, yet if you also find that the defendant was actuated by mischievous or malicious motives, you should find for the plaintiff. However much it may be true, that it is no libel upon one's character to publish the truth about it, if the motive be a good one ; yet it would be a gross abuse of the constitutional privilege of *printing*

Delaware F. & M. Ins. Co. *v.* Croasdale.

*upon any subject*, to drag before the public the private character of a person, for the malicious purpose of injuring or destroying it. There is no worse enemy to the peace and quiet of society than he who publishes defamatory articles against another. And the owner or controller of a printing press has no more right to print or publish libellous matter than any one else; nor is he under any obligation, that the law recognizes, to the public (as one of the pleas alleges) to print and publish current or common reports for the information and protection of persons interested in anything, though having printed it in good faith, he is not to be subjected to punitory damages for so doing.

Has the defendant, in this case before you, made good his pleas? that is has he proved them to your satisfaction, and was he free from malice in publishing what he did of the plaintiff? If he have, indeed, made them good, or proved them, your verdict should be for him, unless the plaintiff has satisfied you by something in the case (for no proof has been offered by him through witnesses to establish it) that the motive of the defendant was malicious and such motive will be taken to have been a good one if the charges have been proved true, unless proof to the contrary be made by his adversary. And here, it is proper that I should tell you what malice is, in legal contemplation. In common speech, malice means ill-will, hatred, malevolence, spite, vindictiveness, or other of the malignant passions of the human heart; but when we speak of malice as a subject of legal contemplation, we mean *the doing of an act or wrongful act purposely done without just cause.* Hilliard on Torts, 351. The motive of the defendant, where there is no testimony offered with respect to it, " is to be gathered from the circumstances attending the publication. If the attending circumstances prove nothing one way or the other about the intent, then the intent must be gathered from the paper itself, and if that is libellous—if it tends to vilify, defame and injure the plaintiff—the inference of law as well as of common sense is, that *such was the intention,* and the publication is therefore taken to be *malicious.*" Layton *v.* Harris, 3 Harrington, 407. Let us turn now to the defendant's proof.

Delaware F. & M. Ins. Co. *v.* Croasdale.

Of course if the defendant has failed to prove the truth of his charges against the plaintiff, the latter must have a verdict against him. Has he proved the language of the alleged libels to be true? That is the question, and the vital one in this case. Has he made such proof as satisfies your minds that the plaintiff was a *fraud* that is a *dishonest fraudulent* concern? Let us look to the evidence offered by him for that purpose, and the opposing testimony presented by the plaintiff.

I shall not fatigue you by rehearsing all the testimony in this case, for it is doubtless well remembered by you, unless indeed from the great length of time employed in producing it (about five days and a half) your minds have not been able to retain it. It would consume quite another day, if I were to recount it all. I shall therefore only call your particular attention to the most prominent features of it, leaving you to connect the rest with what I present.

The defendant has shown to you by several witnesses, who were the first officers of the corporation plaintiff, that it commenced its business both as a stock company, and as a mutual company. A stock company is authorized to receive subscriptions of stock, and issue policies of insurance upon the credit of it. The object of the stock subscriptions is to provide a fund for the payment of the policies when loss occurs. In fact it can have no other means therefor, according to the usual condition of such companies. Those witnesses, one and all, who spoke upon the subject of the state of the stock company, told you that no subscriptions of stock were ever made that were paid; in other words that the company started in business at Delaware City without any capital at all. How then did it become possessed of anything by which to meet any losses by fire that might occur? The answer made by the testimony of some of those witnesses is—that the company accepted mortgages for the several amounts stated and exchanged its own stock therefor. If these mortgages were really worth their face value, then the company obtained a stock capital thereby, whatever we may think of the quality of it.

One or more of these mortgages was of a tract of land con-

Delaware F. & M. Ins. Co. *v.* Croasdale.

taining twelve hundred and four acres, situated in Dauphin County, in the State of Pennsylvania, and was for the sum of fifty thousand dollars; another was of a tract situated in Clinton County in the same State, and was for five thousand dollars; another was upon three several tracts in Du-Page County, in the State of Illinois, and was for the sum also of ten thousand dollars; and there was afterwards another upon a tract of land called the Gray farm, in Red Lion Hundred, in this county, and was for the sum of five thousand dollars. Other mortgages were proved to have been transferred to the company, but its chief officer, William Bright, denies any knowledge of such, and as such denial is against the interest of the company, it is fair to presume that the witnesses must have been mistaken with respect to them. The defendant, however, in support of his defence, alleges that these mortgages were really of extremely small value, if, in fact, they had any, and his witnesses referred to, state, some of them, that they withdrew from the company in consequence of their belief of that fact, not choosing longer to remain in a company without any real capital. If these mortgages in fact were of no value, or of very trifling value, then you would be warranted in concluding that the company was a fraudulent one, for it is impossible to conceive of an honest stock insurance company beginning and carrying on business without capital. Such a concern would be justly styled a fraud. And as the charges against the company made by the defendant, are that it was a fraud—charges that if not true are libellous—it is of the utmost importance to him that he shall have made them good to your satisfaction. The question is, has he done so?

The chief reliance, apparently, by the defendant in establishing his defence, is to show that the lands upon which the mortgages rest, are no security of any account for them. There are other reasons given why the company is a fraudulent one, which will be noticed hereafter. Now we will look alone to the mortgaged lands. And here I will say to you that no direct effort has been made on either side to impeach the character for truthfulness of any of the numerous witnesses who have testified

Delaware F. & M. Ins. Co. *v.* Croasdale.

in this case. They all appear to you to be men of credit, though there is immense discrepancy in their testimony on some points.

The defendant has produced before you seven witnesses, I believe, to prove the real character of the Dauphin County land ; persons who, at the instance of the defendant, or in his interest, went to it in order to be able, as we suppose, to give testimony at this trial. They say they examined it, found it to be a mountain tract without any improvements, and consisting for the most part of rough land, covered with rock and a sparse growth of valueless wood, or scrub oak, except about 150 acres, more or less, set in what, according to their description, could be called timber, with a very small clearing at the foot of one side of the mountain. They describe it, also, as being about three and one-half miles from any railroad station, and those who profess to speak from any knowledge in that respect say it had no appearance of having any ores or minerals of any kind upon it, and they all say they saw no iron ore whatever there. Altogether, the picture they presented to you of it was a very dreary one, and none of them placed its value at more than $2 per acre. One went so far as to say that it was not worth the taxes upon it. If this testimony is to be taken by you as the true estimate of the value of the tract of land, then the chief item of the property of the company with which to pay its losses is well-nigh worthless, and the policy-holders of the concern are in sorry plight indeed. These witnesses, we must suppose, spoke what they believed to be true.* We have no reason to doubt their sincerity, as they have no interest in this case. But the plaintiff opposes to this testimony that of other persons, and they give a totally different account of this property. Laying aside the sworn statements of Messrs. Bright and Tantum upon this point, not, however, as in any respect impeaching their credibility

* Those whose depositions have been read, Messrs. Spayd, McCanaan, and the others, speak from long-standing knowledge of the land and acquaintance with land in the neighborhood, and the others examined it with a view of knowing what it was really worth, and they are very emphatic in their statements.

(though they both, in a certain sense, being chief officers of the company, occupy the position of plaintiffs in this action), your attention is called to the testimony of the brothers Ferree and Mr. John S. Musser. All these persons testify that they have been acquainted with this land for many years, and have frequently, in times past, been upon and over it. One of them, Uriah D. Ferree, states that he is a land surveyor and civil engineer, and his brother has assisted in surveying also. The former says that he has special knowledge of the value of land, having been often called upon to determine the value of such property. These witnesses also reside near this property, and profess to be acquainted with the value of mountain land, and of timber growing upon the soil. At the instance of the president of the company (Bright) they made an examination of this tract to ascertain its value and testify about it before you. In May last Uriah D. Ferree states that he spent two days with Bright and Musser in making an inspection of it, and his brother states that he was with them the last day. They give you, in detail, an account of the kind of timber growing upon it, that is, the different species of trees, and their quality; they tell you the estimate they made of the mine props that could be cut upon it, the number of feet of them and their value at the coal mines close in the neighborhood; the number of chestnut rails that could be made from the timber there; the number of railroad sleepers, or cross-ties—all of which different articles they state are in demand in that region. It appears also from them, or some of them, that there is a railroad station not more than one mile and an eighth distant from the tract. They further testify to you that there is an excavation on one side of it from which iron ore has been raised, and that several tons, from six to ten, are now lying upon the ground there plain to be seen; and they say that no one could have made a thorough examination of the premises without seeing it, unless the ground had been covered (which does not appear to have been the case when the witnesses for the defendant made their inspection) with snow. And Uriah Ferree states that no one not previously acquainted with them could possibly have made any proper examination of these lands, to ascertain their

real value in the time employed for that purpose by most of the witnesses in behalf of the defendant (which was one day in in last month), nor in less than three or four days. It appears also from the testimony of Leander Ferree that he resorted to very careful means to make up his estimate of this land's value. The testimony of the Messrs. Ferree is corroborated by that of Musser; and in support of that statement about the iron ore, they produce in court specimens which they allege were taken from the excavation.

Furthermore, the witnesses fix the value of the land, denuded or stripped of all the timber upon it, at ten dollars per acre. Adding up their several estimates of value, all these three witnesses place it at a sum much beyond the amount of the mortgage upon it, and Uriah Ferree states that he would consider a mortgage of forty or forty-five thousand dollars safe upon it.

Here, then, as I have before said, you have great discrepancy of testimony, the defendant's witnesses proving the land to be almost, if not wholly, worthless, and those for the plaintiff making totally different proof, and estimating it at a value much beyond the face amount of the mortgage, which is fifty thousand dollars. What are you to do in such a distressing state of contrariety of testimony? I can only answer by telling you to give your faith to those witnesses who, in your judgment, are, under the circumstances, most worthy of your credit. You must reconcile the statements of these witnesses if you can; if you cannot, give your credence where, in your judgment, the most reliable proof exists.

Let us now look at the testimony, with respect to the value of the Gray Farm in Red Lion, upon which, as you will recollect, there are two mortgages, one for three thousand five hundred dollars, held by John Ferris, and the other for five thousand dollars by, or for, the insurance company, the plaintiff—the former being considered a prior lien to the latter, the latter being part of the company's assets. Mr. James B. Henry, one of the defendant's witnesses, puts its cash value at six thousand dollars, the quantity of land being, as he says, one hundred and forty-two acres. Mr. Charles B. Ash, another one of those witnesses,

thinks it would be worth seven thousand dollars, and Mr. J. Thomas Price, the assessor of the hundred, and Mr. John T. Chears, also testify to its value, one putting it at seven and the other at six thousand dollars. All these witnesses reside in the hundred and are familiar with the land. And the same is also the case with the plaintiff's witnesses, Messrs. Lewis E. Pennington, Thomas W. McCracken, William J. Strand and Theodore Jones, none of whom rate the land at a less price than ten thousand dollars, and Jones says it contains one hundred and fifty acres. Here is other discrepant testimony, but as the witnesses are personally known, no doubt, to some of you, you will have, perhaps, less difficulty than in the other case in determining where you should decide the best estimate to be. Should you take the estimate of the defendant's witnesses, rather than that of the plaintiff's, then the company's mortgage would be insecure; but otherwise, if you rely most upon the latter.

According to my recollection, there was no proof offered by either side of the value of the Clinton County land—that is, the land in that county in Pennsylvania—except that of the witness William Bright, who testified, on Tuesday, that he made inquiries in Philadelphia of persons who said they were familiar with it, and from such he felt it was safe for what they were putting upon it—the mortgage of five thousand dollars—and that such inquiry was made before he presented his first report. In the absence of any proof from the defendant, you will be warranted in concluding that this tract was worth at least the sum risked upon it—five thousand dollars—but you are not bound to do so, but, may treat the proof of value made as insufficient.

It appears from the testimony that another part of the assets of the company consisted of three mortgages, one of five thousand dollars on what is called the Nicholls farm in Kent County, near Du Pont Station, on the Delaware Railroad, and the others, one for five thousand dollars, and the other for two thousand dollars on what is called the McKee Farm on the opposite side of the county road; the first containing two hundred and eighty-two acres, and the second one hundred and seventy-four acres, according to the testimony of Mr. Andrew J. Wilson. The com-

Delaware F. & M. Ins. Co. v. Croasdale.

pany's mortgage on the Nicholls farm is, as stated, five thousand dollars, and those on the McKee farm amount together to seven thousand dollars. It is a part of the defendant's case' to show the insecurity of these mortgages, and he has produced before you the witnesses, Andrew J. Wilson and Harvey D. Learned, for that purpose, who swear to their knowledge of the respective tracts, having known them for many years. The former estimates the Nicholls farm to be worth about twenty-five dollars per acre, and the McKee farm about thirty dollars. This estimate gives a value to the Nicholls farm of seven thousand and fifty dollars to sustain the mortgage of five thousand dollars against it; and to the McKee farm a value of five thousand two hundred and twenty dollars only, to support the two mortgages against it of seven thousand dollars. Mr. Learned puts the McKee farm ten dollars higher per acre, thus raising the value by the sum of seventeen hundred and forty dollars, and making the value of the whole the sum of six thousand nine hundred and sixty dollars, forty dollars less than the mortgages against it. He rates the Nicholls farm at the same price per acre that Wilson does. The result is, that the Nicholls farm, according to the value set upon it by the defendant's witnesses, is two thousand and fifty dollars, or two-fifths greater than the mortgage of the company upon it; while the value of the McKee farm, according to Wilson, is nearly nineteen hundred dollars less than the mortgages, and according to Learned only forty dollars less. The plaintiff, in reply to this testimony, has produced before you two witnesses on his part, William McCaulley, of Wilmington, who owns land adjoining the Nicholls tract, and Moses Rash, of Kent County, Mr. McCaulley's land agent, or steward there, and one who has always known these lands. Mr. McCaulley puts the Nicholl's farm at thirty dollars per acre, higher by five dollars than the estimate of Wilson and Learned, thus raising its value to eight thousand four hundred and ten dollars, or three thousand four hundred and ten dollars above the mortgage; and the McKee farm at from fifty to sixty dollars per acre, thus raising its value, at the lowest rate, to eight thousand seven hundred dollars, or one thousand seven hundred dol-

lars more than the mortgage against it; and Mr. Rash values the McKee farm at the latter rate, or as he said, at eight thousand dollars, which he said it would bring at a cash sale, and the Nicholls farm at the same value as the defendant's witnesses did, twenty-five dollars per acre. Mr. Rash, in reply to a question, said that he should regard five thousand dollars a safe investment on the McKee farm. There is no other testimony about the value of these lands, and you must, therefore, make up your minds as to their value from it. There seems to be no difference of a serious character about the Nicholls farm, the mortgage upon which would seem to be well secured; but there is discrepancy of estimate about the McKee farm, and you must reconcile it if you can; if you cannot, you must select that you think entitled to most weight and give your assent to it, bearing in mind, at the same time, that one of the defendant's witnesses (Learned) estimates, as I have said, the McKee farm at a price which is equal to the face of the mortgages, less the sum of forty dollars.

The defendant also offered witnesses to prove the value of certain land, amounting to four hundred and twenty-six and a half acres, situated in Murderkill Hundred, in Kent County, lying between the Willow Grove station and Canterbury, in what is known as the " Owl's Nest " section. Mr. John H. Gooden, the Recorder of Kent County, one of those witnesses, thinks it would not be safe to loan more than three thousand dollars on the credit of the whole. Ex-sheriff Wilds, another of those witnesses, sold ten acres of the whole, under legal process, at the sum of thirty-two dollars, and another tract, of sixteen and a half acres, for the sum of one hundred and eleven dollars; and J. H. Hoffecher, Esq., of this bar, testified, that at a sale made to foreclose the first mortgage on this whole land, he bought it in for his client at the sum of one thousand dollars. It appears by the Kent County mortgage records, that there was a first mortgage on this body of land of six thousand dollars, and a second mortgage of fifteen thousand dollars made to the plaintiff in this action. It appears, also, by the Kent County deed records, that this land was conveyed by the defendant's witness, George B. Money, during his

Delaware F. & M. Ins. Co. v. Croasdale.

presidency of the company, or about that time, viz., in December, 1875, to James H. Myers, so often mentioned in the progress of this case, for the consideration of fifteen thousand dollars, who made the mortgage of it above mentioned to the plaintiff. It is plain that this mortgage was no security whatever for the money which it represents—the sheriff's sale of the mortgaged land showing that only one thousand dollars could be obtained for it. The defendant relies upon this worthlessness of mortgaged land as a fact sustaining, in part, his defence of the truth of the alleged libels; but he is met by the testimony of Mr. Bright, who, upon his oath, states that he is president of the company, plaintiff, and that he never heard of the Murderkill Hundred mortgage, and knows nothing of it. Whether the witness speaks truly or not is a matter for you. If you think he does, then he must be taken to have spoken from knowledge of the company's affairs. If he so spoke, then the transaction with respect to the Murderkill Hundred land must have been one between Money and Myers, which was not entered in the books of the company, nor evidence thereof filed with the company's papers. These facts you must settle for yourselves. With respect to the Du Page County, Illinois, land, taking the testimony with respect to its value given by the defendant's witnesses in their depositions, and we must treat the mortgage on that land, held by the company, as worth very little, indeed. We will now turn to the other matters presented by the defendant to sustain his pleas.

The examination of the affairs of this company by a committee of insurance men of the different insurance offices of Wilmington, and their report against it, is presented as a prominent fact in support of the defence. This investigation was made by a committee of competent persons, aided by experienced counsel, and embodies a statement, honestly made beyond a fair doubt, of the condition of this company, taking the report of commissioner Hines, of Maryland, as its basis; but the committee do not, from the statement of its members, appear to have examined any documents or records, whatever, to justify the conclusion against the company which they arrived at, much less did they investigate the value of any of the mortgage securities by in-

Delaware F. & M. Ins. Co. *v.* Croasdale.

specting the mortgaged land, or having it done by an agent. Whether such a report, and the evidence of those who made it, sustains the defence of the defendant, is a matter for you to determine.

Again, the defendant produces before you the report of our own Commissioner of Insurance, John R. McFee, Esq., about the affairs of the company, and that is relied upon as proof that the defendant's charges were true. Mr. McFee rejected all these mortgages from the item of cash assets, as he had not only the right, but the duty upon him, to do—for they were not immediately available as cash, nor as securities presently convertible into cash—and found a sum remaining, however, which according to the testimony of William A. Lammot, with respect to the relation of cash assets to liabilities of the Farmers' Fire Insurance Company, of which he is secretary and treasurer, is greater than that of his company—the proportion of cash assets of that company to its liabilities being about two per cent., whereas those of the plaintiff to its liabilities, according to the report of commissioner McFee, are about four per cent. by a calculation of percentage of William A. Reynolds, a competent authority in matters of arithmetic. This, however, applies only to the mutual business, and not to the stock business, which is the true subject of examination.

Further, the defendant, for the purpose of affecting the question of damages, offered proof of the condition of this company according to common report. That proof is the testimony of officers of other insurance companies doing business in Wilmington. It does appear by their evidence that this company had a bad name in the business—that is, among the other companies— and one of the witnesses stated that he had heard it spoken of discreditably outside of insurance circles. It would seem, however, that this reputation was founded upon the Maryland commissioners' report, and the examination of the mortgage records by the counsel employed by them, and went no farther. Now, the rule with respect to impeachment of character (where that is in issue) is this—that the evidence shall be of the *general character* of the party in his neighborhood; not what A., B., or C.,

Delaware F. & M. Ins. Co. v. Croasdale.

think of him, but what the people generally say about him; which is, his reputation generally among his neighbors, those best acquainted with him. We do not mean that the business-standing of one is not best proved by business-men of his own calling, but, that that alone should not be relied upon to prove a party unworthy of credit, for an obvious reason not necessary to be given, as the jury can well understand it. It is but reasonable that there should be something more when, as appears in this case, the bad reputation alleged appears to be because of an investigation which certainly was not thorough, but apparently the contrary. It appears from the testimony of the defendant's witness, William Tatnall, upon his cross-examination, that the impression left on his mind is, that Dr. Tantum asked him to investigate the affairs of the company, but that no investigation was made; the reason therefor, given by him, being, that he understood him to propose it as a private individual, and he felt a delicacy about acting upon such request. Mr. Tatnall knew that Dr. Tantum was vice-president of the company; he says so distinctly. If this company was in bad repute, and its financial condition of unsoundness was well known to Mr. Tatnall, as he states, and he would have been willing to examine it if the officers of the company had requested it (for he states he would have been), it is to be regretted very much that he did not seek to know from Tantum whether the company would consent to his examination. But this has not much to do with the question before you, except as it may affect the value to be placed upon the testimony. The question for you, then, is this—ought you to conclude that this company was a fraud, upon reputation which is shown to have had no other foundation than a report of other insurance men who made no examination of its affairs beyond taking the statement of the Maryland commissioner, in evidence before you, and the searches of counsel of the mortgage records? That is for you to decide. If you think that the truth of the defendant's charge, that the company is a fraud, is established by reputation based upon such facts, it is in your power to do so, and it is your right to do so; for, whether the company was a fraud or not, is not for the court, but for the jury to decide. All

we have to do with the testimony is to rehearse it, where we attempt to do so, fairly and impartially, and to point out to you the ordinary rules for testing its value.

The defendant has gone still farther, and has produced before you witnesses to prove that they withdrew their insurance from the company, by reason of its bad reputation, and their apprehension of danger; but it does not appear that there was any withdrawal by policy holders until after the publication of the articles against it in the *Every Evening*; and he also proved in the outset of the defense, by some of those who were originally officers of the company, that they dissolved their connection with it because they were not satisfied with the conduct of its business and did not choose any longer to be connected with it. But the second President, Mr. James B. Henry did not withdraw for any such reason, nor at or about the time the others did, but he held on until his time expired in June, 1878, giving two reasons for withdrawal, not necessary to repeat, as they are no doubt remembered by you, neither of which, however, had anything to do with the standing of the company; and in answer to the direct question put to him, upon cross-examination, by the plaintiffs' counsel whether he considered the company a fraud, he answered as had another of the defendants' witnesses, George B. Money on his cross-examination, that he did not. And it will also be remembered by you that upon the cross-examination of another of the defendants' witnesses, Commissioner McFee, to the same question, he made like answer. In fact, the commissioner could not answer otherwise; for if he had believed the company to be a fraud, a supplement to the law under which his office was created, made it his duty to stop its operations when they appeared to be fraudulent. But you are not to be controlled in your judgment upon the truth of the charges against the company by the action of Money, Ash and the other original directors on the one hand, nor the declarations of the former, Henry and the commissioner on the other; but are to take all the evidence on both sides including that of Joseph L. Carpenter and others who examined the affairs of the company, and his confidence in its integrity by withdrawing

Delaware F. & M. Ins. Co. *v.* Croasdale.

from other companies and insuring in it—and this since the charges—and form your judgment upon it. In this connection, it is my duty to call your attention to the testimony of the expert whom Mr. McFee employed to assist him in his investigation of the affairs of the company, Mr. William Muir, of Philadelphia, a gentleman of large experience in investigating the affairs of insurance companies. As a result of Mr. Muir's examination, the company was in his opinion not doing business upon a sound basis and he advised Mr. McFee to wind it up; but then he excluded from its assets the mortgages which I have passed in review, and the notes of Bright and others held, or in possession of the company, and looked to nothing as assets but money or something immediately convertible into it. Upon this showing the company had not a sound basis, according to his notion of soundness; but whether it was therefore a dishonest concern, a fraud, it is for you to decide. Under the old State banking system, it was not considered safe to circulate a greater proportion of paper than three dollars for one of coin to redeem it with; and a bank that did it, was not considered as doing a sound banking business according to financial theories of banking. But it was nevertheless true that most banks did keep out a larger circulation of notes than three for one and proved in the end to be very honest banks notwithstanding. This concern may have been guilty of gross imprudence in conducting its business, and not been fraudulent in so doing after all. And it is to be considered that no proof has been made that any insured party except perhaps one in its early stage ever lost a dollar by it; although there is proof that some settled at less than the amount of the policies, and some even refused payment on the ground that the company had been defrauded in making theirs. You have the proof by Dr. Tantum of the amount the company has paid in losses. It is, I think over one thousand seven hundred dollars.

I think, gentlemen of the jury, that I have gone over the material grounds of the defence made in this case, and they are now left for your consideration along with the case presented by the plaintiff; but you are not thereby to consider yourself restricted

Delaware F. & M. Ins. Co. *v.* Croasdale.

to what I have laid before you, but are to review and examine all and everything the parties have offered to you in their behalf respectively, and endeavor to do perfect justice between them. But before committing the matter to you entirely, it is proper that I should repeat what the court takes the law to be by which you are to be governed.

We have said to you that the words alleged in the declaration to have been written and published by the defendant, are libellous; we have further said that, if you are satisfied by the evidence which I have called your attention to—his editorship in chief of the paper, that the charges are editorial matter, that they were not written by the assistant editors, nor so far as they know by the other persons spoken of by them who sometimes wrote editorials, and that the publication manager sent all matter delivered to him for publication to the type setters—I say if you are satisfied by these facts, and the knowledge an editor must have of what is done with his effusions—that the defendant wrote the articles of libel, then other questions are to be considered ; but if you are not, you should say so by a verdict of not guilty, which as I have said, will terminate the case. But if you shall be satisfied that the defendant composed these libels for publication, then you are to determine whether the charges made are true If they are true and were published for the sole and proper purpose of public information he should have your verdict; but if they were really published by him maliciously, that is not for an honest, fair purpose and not properly and solely for public information, but from ill will to the plaintiff and for the purpose of gratifying his personal malevolence against it, and to do it mischief and injury, he should not, but you should find against him. For although the truth is a perfect defence against an alleged libel, yet the law will not allow any one to use it against another to shield his own malevolence, but on the contrary will punish him for his malice. If you are satisfied that the charges made by the defendant are not true, or rather were not true at the time they were made, then your verdict should be that he is guilty.

The counsel for the defendant have urged upon us the con-

sideration that, if your verdict should be against their client, you should be governed in the assessment of damages by instruction from the court, which we are asked to give; that, as the defendant was the editor of a newspaper, he should be treated differently from a mere individual who publishes a libel. We cannot so instruct you. The publisher, even, of a newspaper is entitled to no immunity for disseminating a libel, although he might claim to be under some obligation to expose fraud; how, then, can a mere editor be, who is simply employed to supply the editorial matter for the press? · But this idea of immunity of any sort, because of being publisher or editor of a newspaper, is a wholly fallacious one; and if allowed would, as we think, be very dangerous in any community. Instead of a libel suit now and then, we should have them continually, and a great many more nine-days' trials would be held in the courts. Every man has the right, guaranteed to him by the constitution, to print upon any subject, being responsible for the abuse of that liberty; that is, he must take care to print the truth, and that with a good motive where it concerns the reputation of individuals or corporate bodies. If he print libellous matter maliciously, though it be true, he is answerable in damages for so doing, as well, though of course not to the same extent, as if he printed a falsehood maliciously. This law applies to publishers and editors as well as to other individuals, and they have no privilege in this State not common to everybody else. It is unnecessary to enlarge upon this subject; it is sufficient to give you the law for your guidance.

Should you, after fair and honest deliberation upon the law and the testimony in this case, find that the defendant wrote these libels for publication, and that they are not true, the plaintiff will be entitled to some damages at your hands, whether he have proved any or not; for the law implies malice where the libellous matter is false, and the jury must give the plaintiff damages; and, where it is shown that the defendant was actuated by any express malice—that is, wicked design to injure the plaintiff—the jury are warranted in going to a great length in assessing them. Also, where the words published are proved to

Delaware F. & M. Ins. Co. *v.* Croasdale.

be true, and yet they were published for the purpose of injuring a plaintiff from a malicious motive, he is entitled to damages. And, in all cases where a plaintiff is entitled to damages for a libel, he is entitled to recover all he can prove he has sustained by the act of the defendant, whether the publication be maliciously made or not. If, therefore, in this case you are satisfied by the testimony of the plaintiff, offered for that purpose, that he has sustained actual pecuniary loss—and you find a verdict for him—you may compensate him, by such verdict, for the amount he has proved as such loss. A jury is not restricted, however, to actual loss, if there be express malice, but may punish him by their verdict for the malice, and compensate also for the loss. But a jury should have good proof (but this may be by circumstances, such as conduct and the like) of actual malice before they undertake to give damages on account of it. And, although common report, or common rumor, does not justify a libel, yet, if it be proved to have existed when the libellous words were published, and there be no evidence of express malice, and no actual loss or injury done the plaintiff or suffered by him, the damages for the implied malice, merely, should be small—merely nominal. Finally, no inference of the truth of the fact that the defendant wrote these libels for publication is to be drawn from the circumstance that he declined to answer the questions put to him to prove that he did, on the ground that his answers might criminate him.

Verdict for the defendant, Dec. 6th, 1880.