LORILLARD TOBACCO COMPANY, a Delaware corporation, Defendant Below, Appellant/Cross–Appellee,

v.

AMERICAN LEGACY FOUNDATION, a Delaware non-profit corporation, Plaintiff Below, Appellee/Cross–Appellant.

No. 579, 2005.

Supreme Court of Delaware.

Submitted: April 26, 2006.
Decided: July 17, 2006.

---

25. On remand, DFS should be ordered to develop a plan for reunification.

Stephen E. Herrmann, John A. Parkins, Jr. (argued), and Steven J. Fineman, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Jim W. Phillips, Jr., Robert J. King, III, and Charles E. Coble, Esquires of Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., Greensboro, NC; for Appellant/Cross–Appellee.

David C. McBride, Martin S. Lessner, and Christian Douglas Wright, Esquires, of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware; Of Counsel: John Payton, David W. Ogden, (argued) Stuart F. Delery, Paul R.Q. Wolfson, Pav-

nett Singh, and Carey Bollinger, Esquires, of Wilmer Cutler Pickering Hale and Dorr, LLP, Washington, DC; and Ellen Vargyas, Esquire, General Counsel, Washington, DC, for Appellee/Cross–Appellant.

Don A. Beskrone, Esquire, of Ashby & Geddes, P.A., Wilmington, Delaware and Michael C. Hefter, Matthew L. DiRisio, Kristien M. Kahn, Esquires, of Dewey Ballantine, LLP, New York, NY, for Citizens' Commission to Protect the Truth, for amici curiae.

John Friedlander, Esquire of Bouchard Margules & Friedlander, P.A., Wilmington, Delaware, and Olha N.M. Rybakoff, Esquire, Nashville, TN, for Alaska, American Samoa, Arizona, Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Idaho, Illinois, Iowa, Kentucky, Louisiana, Maryland, Massachusetts, Missouri, Montana, Nevada, New Mexico, New York, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Washington, West Virginia, Wyoming and Wisconsin, for amici curiae.

Thomas G. Maculey and Elizabeth D. Power, Esquires, of Zuckerman Spaeder, LLP, Wilmington, Delaware and William B. Schultz and Alexandra W. Miller, Esquires, of Zuckerman Spaeder, LLP, Washington, DC, for Tobacco–Free Kids, American Cancer Society, American College of Occupational and Environmental Medicine, American Dental Hygienists' Association, American Heart Association, American Public Health Association, American School Health Association, American Society of Addiction Medicine, Association of Schools of Public Health, Community Anti–Drug Coalitions of America, Lung Cancer Alliance, Medical Society of Delaware, National African American Tobacco Prevention Network, National Association of County and City Health Officials, National Association of Local Boards of Health, National Latino Council on Alcohol and Tobacco Prevention, Society for Research on Nicotine and Tobacco, and Tobacco Control Legal Consortium, for amici curiae.

Before HOLLAND, BERGER, JACOBS, RIDGELY, Justices and GRAVES, Judge,[*] constituting the Court en Banc.

RIDGELY, Justice.

Defendant–Appellant Lorillard Tobacco Company appeals the declaratory judgment of the Court of Chancery in favor of the American Legacy Foundation ("ALF") arising from a contract dispute under a Master Settlement Agreement ("MSA") between the nation's largest tobacco companies and forty-six states' attorneys general. Consistent with the terms of the MSA, ALF was created to reduce tobacco usage among youth. ALF sought to do so through advertising which Lorillard contends violates the prohibition in the settlement agreement against "vilification" or "personal attacks" against tobacco companies or their executives. The Vice Chancellor granted ALF"s motion for summary judgment and denied Lorillard's cross-motion for summary judgment, holding that all of the advertisements in issue comply with the MSA as a matter of law.

The primary question on appeal is whether any of ALF"s advertisements in their "truth®" campaign violate the contractual language of the MSA prohibiting "vilification" or "personal attacks." The truth® campaign informs its audience of reasons to stop smoking and includes references to the conduct of tobacco

---

[*] Sitting by designation pursuant to Art. IV, § 12 of the Delaware Constitution and Supreme Court Rules 2 & 4.

companies or their executives. ALF has designed the ads to inform its target audience of manipulative marketing techniques because published research has demonstrated that these types of messages are the most effective ones for discouraging the rebellious, anti-authoritarian segment of young people who otherwise are the most likely segment of the population to begin smoking.[1] Lorillard alleges the campaign vilifies and personally attacks it, tobacco companies generally, and their executives. We agree with Lorillard that the ads do refer to tobacco companies or their executives and in one instance specifically to Lorillard. However, we conclude that Lorillard's appeal is without merit because the campaign's advertisements do not satisfy the plain meaning of "vilification" or "personal attacks." We also conclude that the Vice Chancellor did not abuse his discretion, based on the record before him, when declining to award relief on Lorillard's claim that ALF managed an email server to facilitate personal attacks on Lorillard employees.

ALF has filed a cross appeal, raising the issue of whether it may be sued for alleged breaches of the MSA. The Vice Chancellor held that the tobacco companies may sue ALF for the alleged breaches of the MSA. We agree. Under the preincorporation agreement doctrine, the states who agreed to establish ALF bound the nascent corporation to the terms of the MSA. Since ALF was bound to the terms of the agreement by its incorporators, Lorillard has standing to sue ALF for any breach by ALF of those terms.

Accordingly, we affirm the judgment of the Court of Chancery.

## I. Background

### A. Background of the American Legacy Foundation ("ALF")

We reiterate the background of this litigation as stated by the Vice Chancellor.[2]

This litigation arises out of the historic 1998 tobacco settlement between the nation's largest tobacco companies and 46 of the states' attorneys general. In the settlement, the tobacco companies agreed to fund a foundation charged with creating programs to reduce youth tobacco product usage in the United States. As part of its mission, the foundation created a series of television and radio ads under the brand "the truth." The settlement agreement imposes certain limits on the content of the foundation's activities, including a requirement that its advertising not constitute a "personal attack on, or vilification of" any person or company.

\*    \*    \*

The defendant is Lorillard Tobacco Company, the oldest tobacco company in the United States and a Delaware corporation. The plaintiff is American Legacy Foundation ("ALF"), a Delaware nonprofit corporation formed pursuant to the terms of the Master Settlement Agreement (the "MSA"), a 1998 agreement whereby the nation's largest tobacco companies settled lawsuits brought against them by the attorneys general of 46 states. The MSA requires that the tobacco signatories make collective Base Fund Payments of $25,000,000 per year for nine years. The MSA also requires the tobacco signatories to make collective payments in the amount of $250,000,000 in 1999 and $ 300,000,000

---

1. Lisa K. Goldman & Stanton A. Glantz, *Evaluation of Antismoking Advertising Campaigns,* 279 J. AM. MED. ASS'N. 772, 774 (March 11, 1998).

2. *Am. Legacy Found. v. Lorillard Tobacco Co.,* 886 A.2d 1, 7–8 (Del.Ch.2005).

per year for the next four years for ALF's National Public Education Fund ("NPEF"). These funds have been used by ALF to produce its ad campaigns. ALF's mission, as originally stated in the MSA and later incorporated into ALF's bylaws, is to educate America's youth about the dangers of tobacco products and to reduce the usage of tobacco products by young people. To fulfill its mission, ALF launched an advertising campaign universally known as "the truth" campaign. This campaign involved various television and radio ads aimed at young people that portray the negative side of tobacco products. To make sure that its ads were effective in reaching young people [specifically those young people who are most likely to smoke, *i.e.*, those who challenge authority], ALF purposefully made them edgier and more confrontational than regular television and radio ads. Many ads could be described as "in your face" and "eye-catching."

The funding provided to ALF pursuant to the MSA did not come without restrictions. A majority of ALF's funding was earmarked for the public's education (*i.e.* advertising), and the content of that advertising is made subject to both requirements and prohibitions. The MSA required that the advertising concern only the "addictiveness, health effects, and social costs related to the use of tobacco products." The MSA also prohibited the advertising from being a personal attack or a vilification of tobacco company employees or tobacco companies.

Section VI of the MSA entitled "Establishment of a National Foundation" is at issue in this appeal. Subsection VI(h) establishes the prohibition that the advertising "shall not be used for any personal attack on, or vilification of, any person (whether by name or business affiliation), company, or governmental agency, wheth-

er individually or collectively." The MSA does not define the terms "personal attack" or "vilify."

## B. The ALF advertisements

Lorillard claims the advertisements of the truth® campaign violate Subsection VI(h) of the MSA and focuses on four examples of ads titled: "Shredder," "Hypnosis," "Lie Detector," and "Dog Walker." We have carefully considered these examples and the other ads in the record before us and find no merit to Lorillard's claims that ALF has breached the MSA.

Our analysis begins with a summary of the examples Lorillard has cited. In "Shredder," a cargo truck with the "truth®" logo tows a large machine labeled "Shredder 2000" and stops in front of an office building on a city street. The words "Outside a major tobacco company." appear at the bottom of the television screen. Although the building is Philip Morris's New York City headquarters, the advertisement does not directly disclose its identity or even the city where the ad takes place. Even so, it is conceivable that at least some New Yorkers would recognize the building as the headquarters of Phillip Morris. At various times in the advertisement, people are visible inside the building, but their faces have been pixilated to protect their identity. Two youths stand beside the towed machine, a large wood chipper. The youths use megaphones to address employees in the building. The first announces, "Attention tobacco manufacturers! Do you have a lot of embarrassing reports lying around the office? You can't just leave that job to any paper shredder, you need Shredder 2000!" The other youth agrees, "That is right, folks. You need Shredder 2000 to use on documents like this research report from 1981 that says 'Today's teenager is tomorrow's potential regular customer.'" He

then runs to the mouth of the shredder with a paper report and throws it into the teeth, shredding it. The first youth then asks "Or this report where you actually gauge smoking patterns of sixth graders?" He proceeds to shred the report while the second youth asks another question, "And you know what folks? With the Shredder 2000, you don't even have to take those highly confidential files out of the cabinets." Two more people carry a four-drawer file cabinet to the mouth of the shredder. "You can just throw the whole darned thing in." They shred the entire filing cabinet. "The whole filing cabinet!" exclaims the second youth. The first youth then exclaims, "Heck yeah, and even your briefcase! Shredder 2000 shreds it all!" A man in a hard hat feeds a briefcase into the shredder. The first youth continues, "More effectively, quicker, better than any shredder in this building. Am I right?" The second youth replies, "You are right!" The first youth continues, "I guarantee it!" The second youth asks, "And you know those top secret files you had on your computer? Just throw the whole computer in. It's gone." A computer monitor is shredded. The first youth confirms, "Completely gone. You need Shredder 2000!" While the two youths dance behind the shredder, the ad concludes with a voice that says "Shredder 2000—now available in regular and king-size."

In "Hypnosis," three youths are driving a truck at night. The words "Somewhere in tobacco suburbia." appear at the bottom of the television screen. One youth says, "I'm feeling the vibe, Man. We're going to find these tobacco guys." They stop the van at a convenience store. They ask a passing pedestrian, "Hey, Man. Do you know if there are any tobacco executives around here?" They stop the van at a fast-food, drive-through window. Through the ordering microphone, they ask the employee, "Do you know if any tobacco execu-

tives live around here?" There is no reply. Another pedestrian gives directions, "Go three blocks down, make a left. You'll see some big houses." The youths attempt to confirm the directions, then unfold a map. They drive the van past very large, well-lit houses with large yards. One youth exclaims in awe, "Look at the size of the houses." Another youth replies, "I guess working for an industry that kills over a thousand people a day, ah, pays pretty well." One youth says, "We gotta help these people, Man. Turn on the tape." The youth driving the van agrees, "Yeah. Yeah. Cue the tape." There is a reel-to-reel tape player mounted inside the van. Loudspeakers fixed to the top of the van issue a woman's loud but soothing voice. "I am a good person. Selling a product that kills people makes me uncomfortable. I realize cigarettes are addictive." One youth comments, "It looks like money is addictive, too." The voice continues over the van's loudspeakers, "... kill over four hundred and thirty thousand people each year. Tomorrow I will look for a new job. I will be less concerned with covering my butt and more concerned with doing the right thing." The ad ends with a youth announcing that they are "just trying to help." The voice begins to repeat as the van continues driving through the upscale neighborhood. There is no indication of the city where the ad was filmed.

In "Lie Detector," several youths enter a large, corporate building. The words "Inside a major tobacco company." appear at the bottom of the television screen. The building is the headquarters of Phillip Morris, but as in "Shredder," the advertisement does not directly disclose its identity or location. The name of the building is pixilated to mask it. Again, it is conceivable that at least some New Yorkers would recognize the building as the headquarters of Phillip Morris. One youth announces to the guard at the front desk that

"we have a delivery for the marketing department." The faces of the guards and everyone but the youths are pixilated to hide their identity. The guard asks, "Who are you here to see?" Another youth clarifies, "the VP of marketing." The first youth continues, "You can just tell her we're dropping off a lie detector." They place a large case labeled "lie detector" on the guard's desk. The camera cuts to a woman dressed much as the guards are dressed; her face is pixilated. One of the youths asks, "Hi, are you Rita?" She replies, "No." The youth continues, "We just thought you'd know if Rita was in." The woman says, "I already answered that. Alright? You can have a seat, or you can leave." The youths sit in the lobby and wait. A man appears in a light suit; his face is also pixilated. One youth says, "Hey, look at this guy." The first youth says, "You're not Rita." He shakes the youth's hand, "OK. Can I help you?" The youth explains, "We have a lie detector to clear up the confusion.... Your company has said that nicotine isn't addictive, and then you say that it is." The man asks, "Do you have an appointment with anyone in particular?" The youth replies, "We were told to come to see Rita." The man interrupts, "Leave her a voice mail." The youth cheerfully agrees, "OK. Great." She calls from the front desk and says into the phone, "Hi, Rita.... I just wanted to drop off a lie detector." She looks away from the phone, "She hung up on me.... Maybe it was the wrong Rita." The security guards ask them to leave. While walking backwards to the front door, the youth explains, "OK. We're leaving, but your company has said that nicotine isn't addictive, and then you say that it is, and we're just trying to get at the truth."

"Dog Walker" is a radio ad and begins with the ringing of a telephone. A woman answers, "Good afternoon, Lorillard." The caller says, "Hello, Ma'am. My name is John, and I was hoping I could talk to someone about a business idea." The woman asks, "What is the nature of this business, though?" The caller announces that, "I'm a professional dog walker by trade, and my dogs, they pee a lot, usually on—like—fire hydrants and people's flower beds. I thought, why not collect it and sell it to you tobacco people? Well, see, dog pee is full of urea, and that's one of the chemicals you guys put into cigarettes, and I was just hoping to make a little extra spending cash.... I can send you some samples. I got Chihuahua, Golden Retriever, some high-test Rottweiler pee. It's all good stuff." She then transfers the caller to someone else, who answers the phone with his full name, heard clearly in the ad and not edited or omitted from it. The person hangs up on him at the mention of his "pee proposal." An announcer concludes the commercial, stating, "You've been infected with a powerful contagion. Truth exposes the tobacco industry's deceptions to the light of day. And it spreads. The truth outbreak tour is here. Check out the truth dot com. Infect truth."[3]

## C. The ALF website

ALF maintained a website with an email server where visitors could complete a pre-formatted email to actual tobacco company employees by adding adjectives, verbs, and nouns. For example, one form email read:

Dear Mr. Big Tobacco Executive,

I just wanted to say that I think the way your _____ cigarette company has deceived the world really _____, and I don't understand how you can _____ with yourself selling a _____ product like cigarettes.

It's bad enough that you _____ at _____ knew that smoking

---

**3.** *Lorillard Tobacco Co.,* 886 A.2d at 11–12, 14

(footnotes omitted).

your cigarettes caused cancer, and kept selling them anyways, but then to be deceptive about what you knew and ——————————————— try to cover it up is just plain ————————.

I also wanted to know—was it worth it? How many ——————————— have you been able to buy with all the money you've made addicting people to nicotine? How could all your ——————— ever make up for the ——————— of suffering you've caused smokers and their families as you got ——————— rich hooking them on a deadly product?

Just remember, in the end we ——————— what we ———————.

May the lord have mercy on your pathetic ———————.

ALF placed a warning of the website against the use of profane or harassing messages. Employees at Lorillard and other companies received these emails, sometimes containing profanity despite ALF's warning. Many emails sent to and read by tobacco company employees were malevolent. At a cost of less than $1,000 Lorillard quickly installed a filter that shielded its employees from emails sent by visitors to the website. ALF then removed this e-mail feature from its website.

## D. The Court of Chancery's Declaration

The Court of Chancery held that the advertisements did not violate Subsection VI(h)'s ban on personal attacks. The court further held that the advertisements did not vilify any person or company, either individually or collectively.

To define "vilify" in the context of the MSA, the Court of Chancery did not use any dictionary. While the court referenced the parties' own usage of dictionary definitions as one of the means to define "vilify," it expressly declined to do so in this case.[4] The court explained, that although "dictionary definitions are helpful and instructive, they are not precedent and this court need not rely on them, especially when, as in this case, there are sufficient usages in legal opinions to inform the court as to whether the advertisements in question violate the MSA."[5]

The Vice Chancellor then looked to a variety of sources including Delaware court decisions,[6] United States Supreme Court decisions,[7] federal court decisions,[8] and other legal sources.[9] After reviewing

---

4. *Id.* at 19.

5. *Id.* The Vice Chancellor also stated that "[i]f the court were to rely on dictionary definitions in this case, the court suspects that the litigation would devolve into an argument about the meaning of the words in the definition itself." *Id* at 39.

6. *Id.* at 21 citing *State v. Chandler,* 2 Del. 553, 577–78, 2 Harr. 553 (Del. Ct. of General Sessions 1837); *Rice v. Simmons,* 2 Del. 417, 428, 2 Harr. 417 (1838); *Layton v. Harris,* 3 Del. 406, 407, 3 Harr. 406 (Del.Super.Ct.1842); *Croasdale v. Bright,* 11 Del. 52, 59, 6 Houst. 52 (Del.Super.Ct.1880); *Del. State Fire & Marine Ins. Co.v. Croasdale,* 11 Del. 181, 195, 6 Houst. 181 (1880); *Capano v. State,* 781 A.2d 556, 668 (Del.2001) *aff'd in part and rev'd in part on other grounds,* 889 A.2d 968 (Del.2006).

7. *See id.* at 22 (citing, *inter alia, Phila. Newspapers v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986); *NY Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)).

8. *See id.* (citing *Gibson v. Mayor & Council of Wilmington,* 355 F.3d 215, 227 (3d Cir.2004); *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 182 (4th Cir.2001); *United States v. Burke,* 80 F.3d 314, 317 (8th Cir.1996); *State v. Michaels,* 136 N.J. 299, 642 A.2d 1372 (N.J. 1994)).

9. *See id.* at 24 (citing foreign state court decisions, law review articles, and other secondary sources such as Note, *Group Vilification Reconsidered,* 89 YALE L.J. 271, 308 (1979); Note, *Statutory Prohibition of Group Defama-*

a wide range of legal sources, the Vice Chancellor distilled a definition of "vilify" from the uses of the words by the particular authors of these writings. He concluded that:

the state and federal case law, as well as law reviews, support a view of vilification that is consistent with Delaware law. First, on a textual level, the words of vilification are stronger than disparagement. Second, on a contextual level, the term "vilification" is most often used to describe situations that implicate serious social issues, such as race or gender relations.

While the overwhelming majority of legal sources show a consistent use of "vilification" that is stronger than mere disparagement and frequently "vilification" is used in serious social contexts, there are a small minority of cases that appear to use "vilify" in a watered-down manner.... [10]

The Vice Chancellor placed primary reliance on Delaware court decisions using the word "vilification" concluding that:

Delaware courts have used "vilification" in conjunction with words like blasphemy, licentiousness, hatred, contempt, and ridicule. "Vilification" has also been used in two related cases that concerned an alleged fraud by swindlers who perhaps should have been put in jail. From

these sources, it is clear that Delaware law regards vilification as stronger (*i.e.* more contemptuous or malicious) than disparaging someone.[11]

He then incorporated factors into this high threshold that included the truthfulness of the advertisements and their tone and concluded that the advertisements at issue did not violate Subsection VI(h)'s ban on vilifying persons or companies.

To define "personal attack" the Vice Chancellor again looked to uses of this term by authors in sources other than dictionaries as he did with his analysis of "vilify." He noted that some courts have used "personal attack" in three distinct legal contexts: referring to 1) physical violence; 2) courtroom behavior; and 3) "communications that occur outside of the courtroom." [12] He adopted the third category of "personal attack," for his analysis in this case.

After recognizing the scarcity of "personal attack" cases in both Delaware and United States Supreme Court jurisprudence,[13] the Vice Chancellor noted that "federal courts use the phrase 'personal attack' when categorizing statements that include comparing people to terminal illnesses or alleging that they are criminals." [14] In other words, the authors of both federal and state case decisions use

---

tion, 47 COLUM. L.Rev. 595, 609 (1947); *Village of Skokie v. Nat'l Socialist Party of Am.*, 51 Ill.App.3d 279, 366 N.E.2d 347, 9 Ill.Dec. 90 (Ill.App.1977), *aff'd in part and rev'd in part*, 69 Ill.2d 605, 373 N.E.2d 21, 14 Ill.Dec. 890 (Ill.1978); *Neiman–Marcus v. Lait*, 13 F.R.D. 311, 312 (S.D.N.Y.1952)).

10. *Id.* at 25.

11. *Id.* at 26. The court did, of course, rely on the aforementioned references as well.

12. *Id.* at 33–36, n. 140, n. 152 (citations omitted).

13. *Id.* The court cited *Skouras v. Admiralty Enter., Inc.*, 386 A.2d 674, 679 (Del.1978) as "label[ing] as a personal attack letters from the plaintiff to various governmental and business entities that threatened charges of wrongdoing by the defendant's directors and officers. The letters appear to be sent in connection with allegations of fraud, tax evasion, and corporate mismanagement." Additionally, the court cited to the United States Supreme Court decision in *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 276, 108 S.Ct. 562, 98 L.Ed.2d 592, (1988).

14. *Lorillard Tobacco Co.*, 886 A.2d at 35 (citations omitted).

"personal attack" to mean more than mere criticism. The Vice Chancellor concluded:

> [T]he term "personal" in the MSA's "personal attack" consists of two parts. The first part concerns the target's private characteristics, such as, for an individual, amorality. The second part concerns the specific identification of the target. Case law clearly supports the interpretation that the target must be identified. The court finds that such identification must be specific to a particular person or company. Calling the tobacco companies "the tobacco industry" or "Big Tobacco" does not identify the signatories to the MSA in a specific enough manner to be violative of Section VI(h) of the MSA. Lorillard could have, but did not, achieve a broader prohibition in the MSA by referring to "Big Tobacco" or the tobacco industry specifically. It did not, and there is no reason to suppose that the 46 attorneys general would ever have agreed to such language.[15]

Applying this definition of "personal attack," he stated that Lorillard had the burden of demonstrating that there was an attack and that the attack was personal on it specifically. The Vice Chancellor found that advertisements did not violate the personal attack provision of Subsection VI(h). With respect to the email-generating server managed by ALF, he found that the emails did constitute "personal attacks" but declined to award any damages or injunctive relief because the violation was *de minimis*.[16]

## II. The MSA does not prohibit the truth® campaign advertisements.

■■■■ We review the Court of Chancery's grant of summary judgment *de novo*.[17] Lorillard's primary claim on appeal is that the Court of Chancery legally erred in the procedure it used to define the terms "personal attack" and "vilify" and, in so doing, erroneously granted summary judgment in favor of ALF. Lorillard insists that the Vice Chancellor should have used the dictionary definitions of "vilification" and "personal attack" to determine the plain meaning of these terms. We agree that the Vice Chancellor's abandonment of all dictionaries and his innovative review of how legal writers have used ordinary words in their texts to ascertain the plain meaning of the words are not supported by precedent. Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.[18] This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract. Dictionary definitions change over time, provide the contemporary meaning of ordinary words, and note when a particular definition of a term has become obsolete.[19] Assuming,

---

15. *Id.* at 40–41.

16. *Id.* at 44 (citations and footnotes omitted).

17. *See Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992) (citing *Aetna Cas. and Sur. Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990)).

18. *See, e.g., Northwestern National Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 44 (Del.1996) (using AMERICAN HERITAGE DICTIONARY (1969) to define "under" as "within the group or classification of" without further comment); *Hibbert v. Hollywood Park, Inc.,* 457

A.2d 339, 343 n. 3 (Del.1983) (using Webster's New International Dictionary (2d ed. unabr.1951) to define "party" without further comment); *The Cove on Herring Creek Homeowners' Ass'n v. Riggs,* Del. Ch., C.A. No. 02024–S, 2005 WL 1252399, Noble, V.C., 2005 Del. Ch. LEXIS 71, *5 (May 19, 2005) (applying definition from WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) to unambiguous, but disputed, language in a contract).

19. Courts have recognized that definitions can become obsolete. *See, e.g., Kelly v. Estate of Johnson,* 788 N.E.2d 933, 935 (Ind.Ct.App.

without deciding, that the Vice Chancellor erred in not using dictionaries in this case, we find that this error was of no moment, *i.e.* harmless, because the plain meaning of the terms "personal attack" and "vilification" shown by dictionary definitions still requires the entry of summary judgment in favor of ALF.

▉ When interpreting a contract, the role of a court is to effectuate the parties' intent. In doing so, we are constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended.[20] In *Rhone–Poulenc*, this Court explained the paramount importance of determining what a reasonable person in the position of the parties would have thought the language of a contract means.

> Clear and unambiguous language ... should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist policy language under the guise of construing it. When the language of a ... contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented....

> A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Ambiguity does not exist where a court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty. The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.[21]

**A. The advertisements do refer to persons by business affiliations, to tobacco companies collectively, or to Lorillard.**

Subsection VI(h) of the MSA refers to a personal attack on or vilification of a person, company or governmental agency. If

---

2003) (after each party cited numerous sources, including dictionaries, case law, and the opinion of an auctioneer/appraiser, to support his or her version of the meaning of "furniture," the court recognized that "there is in fact a wide divergence in the meaning given to 'furniture' across sources. Interestingly, it appears that the definition of the term has, to some extent, changed over time. Older sources tend to interpret furniture as all the items in a room, including china, lamps, paintings, and candlesticks.... Newer sources tend to interpret furniture to mean only large movable items, such as chairs, couches, desks, cabinets, and tables."); *Marriott Corp. v. Combined Properties Ltd. Partnership*, 239 Va. 506, 391 S.E.2d 313 (Va.1990) (The trial court determined that the phrase "drive-in food establishment" in 1967 referred to a food establishment that permitted customers to eat food in their cars while parked in the establishment's lot. However, a possible 1990 definition of "drive-in" restaurant might be an establishment with a drive-through window where customers could order food to go. Ultimately, the Court applied the definition as contemplated by the parties in 1967 and affirmed.).

**20.** *See Northwestern National Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del.1996) (citing *E.I. duPont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985)).

**21.** *Rhone–Poulenc*, 616 A.2d at 1195–96 (quotations and citations omitted).

the ad does not refer to a person, company, or governmental agency, the prohibition cannot apply. Here, the ads do refer to a person or company, *either individually or collectively*. We disagree with the Vice Chancellor's conclusion that they do not.

In the Shredder and Lie Detector ads, the settings were expressly "outside" and "inside a major tobacco company." In Hypnosis, one of the youths refers to "these tobacco guys" in a setting "somewhere in tobacco suburbia." In Lie Detector, the youths repeatedly ask for an individual employee by what sounds like her first name, audible in the ad. In Dog Walker, a woman answers "Good afternoon, Lorillard," and the caller explains to the Lorillard employee that "you tobacco people" put urea, a chemical found in dog urine, into cigarettes; the announcer concludes saying, "Truth exposes the tobacco industry's deceptions...."

We agree with Lorillard that ALF's advertisements expressly and impliedly referred to specific companies, the collective tobacco companies, and in one case, to a specific employee by name. The headquarters of Phillip Morris appears in two of the ads. When the evidence is viewed in a light most favorable to the non-moving party as is required on summary judgment, we conclude that advertisements of the truth® campaign did refer to a person (whether by name or business affiliation), tobacco companies collectively, and in one instance to Lorillard. Since they did, we must determine if the ads are "personal attacks" or "vilification" in violation of the MSA. If they are not, we must affirm the Vice Chancellor's ultimate conclusion that the ads do not violate Subsection VI(h) of the MSA.

## B. The advertisements are not "personal attacks" or "vilification."

### 1. The plain meaning of the terms

When a term's definition is not altered or has "no 'gloss' in the [relevant] industry it should be construed in accordance with its ordinary dictionary meaning."[22] There may be more than one dictionary definition, and parties may disagree on the meaning of the definition as applied to their case, but "if merely applying a definition in the dictionary suffices to create ambiguity, no term would be unambiguous."[23] A court must accept and apply the plain meaning of an unambiguous term in the context of the contract language and circumstances, insofar as the parties themselves would have agreed *ex ante*.[24] As we have stated before, the "true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."[25]

**22.** *USA Cable v. World Wrestling Fed'n. Entm't, Inc.*, 766 A.2d 462, 474 (Del.2000) (using RANDOM HOUSE UNABRIDGED DICTIONARY (2d ed.1993); MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed.1997) to define "regularly").

**23.** *Monsanto Co. v. Aetna Casualty & Sur. Co.*, Del.Super. Ct., No. 88C–JA–118, 1994 WL 146005, Ridgely, P.J., 1994 Del.Super. LEXIS 172, *11 n. 5 (quoting *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1324 (E.D.Mich.1988)). *See E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 59 (Del.Super.Ct.1995) ("If the mere existence of different dictionary definitions constitutes an ambiguity, drafting unambiguous contractual language would be impossible without defining almost every word. Standing alone, multiple dictionary definitions do not prove all differing definitions are reasonable.") (citations omitted).

**24.** *See Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1021 (Del.2001) (courts should apply the rules that "generally reflect the contract term that most parties would have bargained for at the time of the agreement") (citations omitted); *Rhone–Poulenc, infra.*

**25.** *Rhone–Poulenc Co.*, 616 A.2d at 1196 (citing *Steigler v. Insurance Company of North America*, 384 A.2d 398, 401 (Del.1978)).

Lorillard would have us define "personal attack" as "negative criticism and negative portrayal of the characteristics, traits, ethics or conduct of tobacco companies or their employees," and "vilification" as "expressions that disparage, depreciate or lower the standing of tobacco companies or their employees." [26] Lorillard cites several dictionaries to define "personal" [27] and "attack," [28] and to define "vilification." [29] Lorillard further contends that "vilification" does not require defamation and is not determined by tone. Finally, Lorillard cites two cases from other jurisdictions defining "vilification." [30] However, both of these cases involved political speech and the First Amendment. We do not find them persuasive in resolving the issue of contract interpretation which is before us.

ALF contends that "vilification" refers to an "abusive statement about the target that is false or unfair." ALF would define "personal attack" as "a bitter or hostile verbal assault on a person identified by name or business affiliation relating to an individual's private life." In other words, ALF contends that the modifier "personal" requires an expressly named target, but neglects to explain why Subsection VI(h) contains an additional modifier "whether individually or collectively." We construe this additional language to mean that no express target is required if the target is collectively identified.

---

**26.** Appellant's opening brief, p. 18–19.

**27.** Appellant's opening brief, p. 29. *See* EN-CARTA WORLD ENGLISH DICTIONARY, 1346 (1999) (*"That personal remark was definitely uncalled for."*) (emphasis added); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, 1686 (1993) (*"relating to an individual,* his character, conduct, motives, or private affairs esp. *in an invidious and offensive manner."*) (emphasis added); THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, 1445 (2d ed.1987) ("referring or *directed to a particular person* in a *disparaging or offensive* sense or manner, usually involving character, behavior, appearance etc.") (emphasis added).

**28.** Appellant's opening brief, p. 28. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, 140 (1993) ("An assault with *unfriendly or bitter* words") (emphasis added); MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY, 74 (10th ed. 1995) ("Assault. A *belligerent or antagonistic* action.") (emphasis added); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 118 (3d ed. 1992) ("An expression of *strong criticism; hostile* comment") (emphasis added); THE NEW OXFORD AMERICAN DICTIONARY, 102 (2001) (*"Criticize* or oppose *fiercely and publicly."*) (emphasis added); THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, 133 (2d ed.1987) (*"criticize severely;* argue with strongly") (emphasis added).

**29.** Appellant's opening brief, p. 33. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, 2552 (1993) ("To make less valuable or important: lower in estimation.... To utter *slanderous and abusive* statements against: *denounce unjustly* or abuse as hateful or vile") (emphasis added). MERRIAM–WEBSTER'S COLLEGIATE DICTIONARY, 1317 (10th ed. 1995) ("To lower in estimation or importance. To utter *slanderous and abusive* statements against") (emphasis added); XIX OXFORD ENGLISH DICTIONARY, 630 ("To depreciate with *abusive or slanderous* language; to defame or traduce; to speak evil of") (emphasis added); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, 1992 (3d ed. 1992) ("To make *vicious and defamatory* statements about") (emphasis added); THE NEW OXFORD AMERICAN DICTIONARY, 1884 (2001) ("Speak or write about in an abusively disparaging manner"); THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, 2122 (2d ed. 1987) ("To speak ill of; *defame; slander* ") (emphasis added).

**30.** *Vanasco v. Schwartz,* 401 F.Supp. 87 (E.D.N.Y.1975), *aff'd,* 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976); *Gietzen v. Feleciano,* 25 Kan.App.2d 487, 964 P.2d 699 (1998).

It is apparent from the dictionary citations provided by Lorillard that a "personal attack" in the context of Section VI is a verbal assault conducted in an invidious, disparaging, belligerent, offensive, and fiercely or severely critical manner.[31] Likewise, the meaning of "vilification," according to Lorillard's own dictionary citations, is a statement that is slanderous, defamatory, or abusive that unjustly denounces its target.[32] The core ordinary meaning of vilification is a denouncement that is both unfounded and abusive or slanderous.

### 2. Application of the MSA to the advertisements

With the boundaries established by Section VI of the MSA in mind, we turn to whether the advertisements before us violate that provision. They do not. The advertisements are not invidious, disparaging, offensive, belligerent, nor fiercely or severely critical. Nor are they denouncements that are both unfounded and abusive or slanderous. The tone of the youth in the advertisements is usually expressly friendly or helpful, even if implicitly drawing attention to unflattering facts about past actions of tobacco companies or their employees. The youth's messages, and thus the advertisements themselves, do not qualify as personal attacks or vilifications. To illustrate the basis for our conclusions, we will use the same four advertisements that Lorillard has presented as examples of breaches of contract by ALF.

In "Shredder," the youths are salesman expressly offering help to an unnamed tobacco company. They are seeking to sell a tobacco company a machine that it could use based on its history and possible need of shredding many documents. At no point do the youths expressly criticize the company for the contents of the documents or the possibility of shredding them. They reveal no disparaging behavior, belligerence, or fierce criticism. Throughout the advertisement, the youths refer to only two publications. The first report contains the phrase, "Today's teenager is tomorrow's potential regular customer." The second report "gauges smoking patterns of sixth graders." Lorillard does not dispute that these reports exist. The youths do not expressly criticize the company for the reports, nor do they unjustly denounce the company for having them. They merely call the reports "embarrassing." They attempt only to sell their shredder to the company because they appear to assume that the company would want to shred the reports. The advertisement may be effective at disseminating an unpleasant fact about an unnamed tobacco company, but it does not amount to a personal attack or vilification.

"Hypnosis" also portrays the youths as helpful. There are several statements that, while critical of the effects of tobacco, are not belligerent, or fiercely or severely critical of the tobacco companies or employees. For instance, one youth observes that "working for an industry that kills over a thousand people a day, ah, pays pretty well." Lorillard does not contend that tobacco-related disease does not kill over a thousand people a day, nor does it contend that its executives are not well paid. The youth's statement is immediately followed by insistence that the youths "help these people," reiterated at the end of the commercial. The closest statement to a personal attack or vilification is the implication that a tobacco executive needs to be "less concerned with covering [their] butt[s] and more concerned with doing the right thing." However, the message again is not slanderous or defamatory, abusive,

---

**31.** *See* n. 27–28 *supra*.

**32.** *See* n. 29 *supra*.

offensive, belligerent, or fiercely or severely critical. As with "Shredder," the "Hypnosis" advertisement may be effective at stating unpleasant facts such as tobacco "kill[ing] over four hundred and thirty thousand people each year," but it does not amount to a personal attack or vilification.

"Lie Detector" shows the attempts of several youth to deliver a lie detector to "a major tobacco company." The entire message of the advertisement is crystallized when a youth explains, "We have a lie detector to clear up the confusion. Your company has said that nicotine isn't addictive, and then you say that it is." This statement simply asserts that tobacco companies have made contradictory statements. The assertion is not presented in a disparaging, offensive, or belligerent manner. It is not fiercely or severely critical. Lorillard does not deny that a tobacco company at one time stated that nicotine is not addictive and then later stated that it is. The contention is not a denouncement that is either unfounded or slanderous. The youths are not abusive, but are merely pleading to see a certain employee. When asked to leave, they leave. We conclude that this advertisement also fails to meet the definition of personal attack or vilification.

The caller in "Dog Walker" maintains an expressly helpful tone throughout the advertisement. His tone is not belligerent, critical, argumentative, disparaging, or offensive. Even though "Dog Walker" involves a bizarre offer to sell dog urine and begins by identifying the company called as Lorillard, the caller simply makes a factually accurate assertion that cigarettes often include a chemical that is also found in dog urine. The caller does not accuse the company of adding dog urine to cigarettes. Although the Lorillard employee hangs up on the caller, there is no personal attack or vilification of Lorillard or its employees.

While the MSA creates real restrictions on ALF's advertisements, we conclude that the advertisements presented to us from ALF's truth® campaign fall within the MSA's restrictions, and do not exceed them. Merely drawing attention to the past conduct of tobacco companies through innocuous and even helpful-sounding offers such as those heard in "Shredder," "Hypnosis," "Lie Detector," and "Dog walker," is not a personal attack or vilification prohibited by the MSA.

### C. The Court of Chancery acted within its discretion when it declined to award relief for ALF's website.

We review a trial court's decision on whether to award declaratory relief for abuse of discretion.[33] The Court of Chancery accepted as true that ALF at one time managed an email server that facilitated receipt by Lorillard employees of emails with expletives and that Lorillard quickly and effectively erected a filter blocking the emails for under $1,000. The Court then stated that these emails were personal attacks on individual employees in violation of Subsection VI(h).[34] Lorillard had a direct claim for requested monetary damages for its cost of blocking the emails was contained within Count V of its amended counterclaims ("Trespass to Chattel") but this claim was dismissed by the Vice Chancellor for failure to prosecute.[35] The Vice Chancellor did not award injunctive relief because the web site function allowing the emails to be sent had been removed.

33. *Stabler v. Ramsay*, 88 A.2d 546, 552 (Del. 1952).

34. 886 A.2d at 40.

35. Final Judgement Order dated November 1, 2005. Lorillard has not appealed that dismissal.

Under the Declaratory Judgment Act, "[t]he court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, will not terminate the uncertainty or controversy giving rise to the proceeding."[36] No tobacco company employee who received the emails participated in this case. We conclude that on the record presented, the Court of Chancery acted well within its discretion when it declined to award declaratory, injunctive or monetary relief to Lorillard for the defunct ALF website activities which were directed to tobacco company employees.

### III. Lorillard has standing to sue for ALF's breach of the MSA.

ALF has filed a cross-appeal in this case. First, ALF claims that its activities are not subject to the "vilification" and "personal attack" restriction of the MSA Subsection VI(h). Second, it claims that Lorillard may not enforce either the MSA or ALF's own bylaws against it.

ALF claims that the MSA imposes the vilification and personal attack restriction only on the funds in the National Public Education Fund, and not on funds derived from Base Foundation Payments. ALF contends that it has no liability for ads funded by Base Foundation Payments whether or not they vilify or personally attack. We need not address this claim because in this decision we have held that the advertisements are not vilifications or personal attacks.

■ ALF next challenges the determination by the Court of Chancery that Lorillard had standing to sue ALF under the MSA, despite ALF not being a signatory to that agreement. ALF claims that the Court erroneously concluded that ALF could be held liable under the MSA since it was neither a signatory to the contract nor ever adopted it. It contends that the States who created ALF have the sole responsibility to seek a remedy for any vilification or personal attack. Further, the only legal mechanism that the MSA contemplated to prevent vilification or personal attacks by ALF was ALF's own bylaws, not lawsuits by the tobacco company signatories. Therefore, it argues that only the States who established ALF, not the tobacco companies, may enforce ALF's bylaws.

■ The Court of Chancery held that ALF's formation was like that of a nascent corporation and applied the doctrine of preincorporation agreements:

American courts generally hold that promoters' contracts made on the corporation's behalf may be adopted, accepted or ratified by the corporation when organized, and that the corporation is then liable both at law and in equity, on the contract itself, and not merely for the benefits which it has received. Accordingly, if the corporation accepts the contract's benefits, the corporation will be required to perform its obligations.[37]

Thus, under Delaware law the doctrine of preincorporation agreements allows a promoter who is establishing a corporation to enter into agreements that bind the nascent corporation.[38]

■ The doctrine applies here because the state attorneys general establishment of ALF meets the elements of a promoter's formation of a corporation, albeit a

---

**36.** 10 Del. C. § 6506. Discretionary relief.

**37.** Carol A. Jones and Britta M. Larsen, 1A FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 207 (perm.ed., rev.vol.2002).

**38.** *See Spering v. Sullivan,* 361 F.Supp. 282, 286 (D.Del.1973); *Stringer v. Elec. Supply Corp.,* 2 A.2d 78, 79 (Del.Ch.1938); *see also* 18 AM. JUR. 2D CORPORATIONS, § 123 (1985); 12 WILLISTON, § 35:71; RESTATEMENT (SECOND) OF AGENCY, § 104 (1957).

non-profit one. The MSA's payment provisions show the parties intended that ALF be bound by the MSA provisions. ALF contends that the doctrine does not apply because this situation is atypical for several reasons, most of which stem from ALF''s status as a non-profit entity. The non-profit status of an entity does not affect its contractual duties, and the preincorporation agreement doctrine applies equally to a non-profit entity.

The Vice Chancellor found that "the MSA in fact contemplates that ALF will adopt [it]." [39] We agree. The Vice Chancellor explained:

> One could almost conclude that the MSA *expressly* contemplates ALF''s adoption because it provides for ALF''s creation and funding, it requires ALF''s board to be comprised of a predetermined group of people, and it places significant restrictions on ALF''s activities. The Settling States (through NAAG) then obligated ALF, through provisions in ALF''s bylaws and Certificate of Incorporation, to comply with the MSA, and the tobacco companies performed their part by providing the required funds.[40]

The Vice Chancellor then enumerated "several express provisions of the MSA that manifest the MSA's signatories' expectation that ALF would ultimately adopt it." [41] We conclude, as did the Vice Chancellor, that "the MSA should be viewed, as a matter of law, as expressly contemplating ALF''s adoption." [42]

 "Under Delaware law, if the subsequently formed corporation expressly adopts the preincorporation agreement or implicitly adopts it by accepting its benefits with knowledge of its terms, the corporation is bound by it." [43] ALF is required to perform its obligations and can be held liable if found to have breached the MSA. The cross-appeal of ALF is without merit.

## IV. Conclusion

The judgment of the Court of Chancery is AFFIRMED on appeal and cross-appeal.

---

**39.** *Am. Legacy Found. v. Lorillard Tobacco Co.*, 831 A.2d 335, 344 (Del.Ch.2003).

**40.** *Id.* at 345.

**41.** *Id.* For instance, Section IX of the MSA provides ALF shall fund public education "in the manner described in and *subject to* the provision of subsections VI(g) and VI(h)." (emphasis added). Subsection VI(h) of the MSA, instructs that ALF "shall not engage" in

certain activities. Subsection VI(e) of the MSA provides that ALF "shall be formally affiliated with an educational or medical institution." *Id.* at 345–46.

**42.** *Id.* at 346.

**43.** *Lorillard Tobacco Co.*, 831 A.2d at 350 (citing *Spering*, 361 F.Supp. at 286; *Stringer*, 2 A.2d at 79).