# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BALTIMORE PILE DRIVING AND MARINE CONSTRUCTION, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N19L-07-090 SKR |
| | ) | |
| WU & ASSOCIATES, INC., | ) | |
| | ) | |
| Defendant, Counterclaimant, Cross-claimant and Third Party Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SELECTIVE INSURANCE COMPANY OF AMERICA, | ) | |
| | ) | |
| Third Party Defendant. | ) | |

## DECISION AFTER TRIAL

Timothy S. Martin, Esq. and William J. Taylor (*Pro Hac Vice*) White and Williams LLP, *Attorneys for Plaintiff Baltimore Pile Driving and Marine Construction Inc. & Third-Party Defendant Selective Insurance Company.*

Edward Seglias, Esq., Emily Letcher, George E. Pallas, Esq. (admitted *Pro Hac Vice*), and Matthew L. Erlanger, Esq. (admitted *Pro Hac Vice*) Cohen Seglias Pallas Greenhall & Furman PC. *Attorneys for Defendant Wu & Associates, Inc.*

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This is a breach of contract action through which Plaintiff Baltimore Pile Driving and Marine Construction, Inc. ("BPDI") seeks damages from Defendant Wu & Associates, Inc. ("Wu") for extra work performed as a subcontractor on a construction project.[1] Wu has filed a counterclaim against BPDI, alleging breach of contract and contractual indemnification.

On January 17, 2018, Wu submitted a bid and was awarded a Delmarva Power & Light Co. ("DPL") contract to construct a new gas material storage shed located at 800 Delmarva Lane, Marine Hub, Wilmington, DE 19801.[2] On March 26, 2018, Wu & DPL entered into a contract in which Wu agreed to construct the shed for $1,121,000.[3] On March 27, 2018, BPDI and Wu entered into a subcontract ("the Subcontract") for BPDI to construct an auger cast grout pile, which serves as the foundation for the shed. The Subcontract was worth $294,450.90. The Project schedule required BPDI to start working in May 2018, but this was delayed due to DPL's difficulties in obtaining the necessary permits.[4] On October 11, 2018, BPDI commenced working.[5]

On October 18, 2018, BPDI claims that it hit its first obstruction while drilling.[6] It claims that it experienced downtime and a loss of grout as a result. On

---

[1] Compl. ¶ 10.
[2] Counterclaim ¶ 1.
[3] *Id.* at ¶ 2.
[4] Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 43.
[5] Compl. ¶ 16.
[6] Pl.'s Proposed Findings of Fact ¶26.

November 14, 2018, it submitted its first change order request ("COR") for the expenses incurred.[7]

From November of 2018 to March of 2019, BPDI submitted 31 work orders to Wu for the money it is now seeking. Wu does not dispute the validity of eleven CORs, of which it converted into Wu CORs, and "passed through" to DPL for payment ("pass through CORS"). Wu does not dispute BPDI's entitlement to payment for eight more CORs, but claims it withheld payment pursuant to its right to a setoff for costs incurred by BPDI.[8] Twelve additional CORs were summarily denied and disputed.[9]

On March 11, 2019, DPL directed Wu to terminate BPDI. DPL cited "repeated ongoing concerns" with BPDI as the reason for its requested dismissal, including a lack of necessary planning.[10] When BPDI left the project, it had installed 60 of the proposed 140 production piles.[11]

On July 29, 2019, BPDI brought suit against Wu & DPL, originally alleging breach of contract, a mechanic's lien, and unjust enrichment.[12] On September 20, 2019, Wu filed an answer and counterclaim against BPDI, alleging breach of contract.[13] On January 6, 2021, DPL moved to discharge the lien upon posting of a bond and compelling posting of a bond by Wu, pursuant to a contractual agreement to indemnify DPL.[14] On February 12, 2021, the Court granted the motion to discharge the lien upon the posting of a bond in the full amount of the lien sought,

---

[7] Ex. 38 - Order Log.
[8] Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 100.
[9] *Id.* at ¶ 101 – 141.
[10] *Id.* at ¶ 68.
[11] *Id.* ¶ 82.
[12] Compl.
[13] Counterclaim, ¶ 15.
[14] DPL's Motion to Discharge the Lien.

$495,746.73. The motion to compel Wu to post a bond was denied. On February 19, 2021, DPL filed a motion *in limine* to stay relevant crossclaims pertaining to DPL until adjudication of the main claims between BPDI & Wu. On April 15, 2021, the Court granted this motion.

On May 24, 2021, BPDI agreed to dismiss its claim for unjust enrichment.

BPDI's remaining claims in this action relate to Breach of Contract (Count II) and the Building Payments Act (Count V).

## II.    THE TRIAL

The Court held a three-day bench trial from May 24-26, 2021. The case was deemed fully submitted for decision after the parties submitted their post-trial briefing.

During trial, the Court heard from and considered the testimony of the following witnesses:

| | |
|---|---|
| David D. Lawrence | Peter Robey |
| Ralph Boedeker | Donald E.W. Stauffer |
| Kirby Wu | Theodore A. Thomson, Jr. |
| Swamy Avasarala | |

## III.    STANDARD OF REVIEW

The Court is the finder of fact in a bench trial.[15] The plaintiff must prove each element of a claim by a preponderance of the evidence, meaning that the Court shall find in favor of the party upon whose side "the greater weight of the evidence is

---

[15] *Pencader Associates, LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *2 (Del.Super. June 30, 2010).

found."[16] Since the Court is the finder of fact, it is up to the Court to weigh the credibility of witnesses and resolve conflicts in witness testimony.[17]

## IV.  ANALYSIS

Both BPDI and Wu have alleged a breach of contract against each other. BPDI claims that Wu materially breached the contract by refusing to accept and/or pay its valid COR requests. It seeks $471,831.50 for outstanding change orders in addition to attorneys' fees and costs.[18] Wu claims that BPDI breached the contract when DPL terminated BPDI from the contract, thus not completing performance and leaving Wu "significantly damaged" in the amount of $41,766.81, in addition to attorneys' fees and costs.[19] This is also the amount that Wu asserts against Selective Insurance Company ("Selective") as BPDI's bonding company. Both parties assert they are due attorneys' fees and costs pursuant to the Delaware Building Construction Payments Act.[20]

For the reasons set forth below, the Court finds that BPDI has proven by a preponderance of the evidence, through credible testimony of its witnesses and the documents relied upon at trial, that Wu breached the Subcontract when it refused to pay BPDI for several of the CORs it filed. Thus, Wu is liable to BPDI for certain COR payments as discussed below.

---

[16] *Id.* (quoting *Pouls v. Windmill Estates, LLC,* 2010 WL 2348648, at *4 (Del.Super. June 10, 2010)).

[17] *Id.* at *3.

[18] BPDI's Complaint and Demonstrative Trial Exhibit "B" have different numbers for the total outstanding CORs. The Complaint lists CORs for a total of $477,839.50 and the Exhibit lists CORs for a total of $497,441.00. In addition, COR #40, which requests $32,554.00, is listed twice in Trial Exhibit "B". For that reason, the Court has made its own calculation of the individual CORs that were submitted.

[19] Def.'s Proposed Findings of Fact and Conclusions of Law at 15, fn 1.

[20] 6 *Del. C*. §3501 *et seq.*

**A. BPDI-Wu Subcontract Interpretation**

**1. The parties claim that alternate provisional language governs the CORs.**

BPDI and Wu claim that two different documents – both of which are incorporated by reference into the Subcontract -- govern the COR claims made by BPDI.

BPDI relies on the BPDI Proposal, which is integrated into the Subcontract by Section 1.3. It states in relevant part, "except to the extent of a conflict with a specific term or condition contained in the Subcontract Documents, the General Conditions governing this Subcontract shall be the AIA Document A201TM 2017, General Conditions of the Contract for Construction, and the Subcontractor's Proposal. . ."

BPDI points to several provisions of the BPDI Proposal that it contends govern the CORs. For example, paragraph 16, under Exclusions, states:

> **Obstruction removal and/or any corrective work resulting from encountering obstructions above/below grade.** Consumables reimbursement will be required and will include, all auger repairs to include welding and nickel facing, auger or bit replacements, replacement of carbide tipped teeth, drilling oils or lubricants, and any hardware accessories damaged while prosecuting the pre-auger holes, drilled shafts, and auger cast foundations for this site.

Paragraph C under Reimbursements states:

> Downtime due to site conditions, other's neglect or oversight of coordination, encountering unforeseen conditions and any underground obstructions that cause stoppage billed at a rate of $985.00 per hour.

A provision under Terms of Payment states:

> "No retainage to be withheld, and NO PAY WHEN PAID CLAUSES ACCEPTED."

On the other hand, Wu argues that the Wu Addendum governs the CORs. Article 15 of the Subcontract states that the Agreement is composed of several documents, including an Amendment to Standard Form Agreement between Contractor and Subcontractor "as modified on. . . 4/16/18."

Paragraph 9 of the Wu Addendum, titled Change Order Requests, states in part:

> The Subcontractor must make any change order claims to the Contractor for damages or additional compensation based on alleged extra work, changed conditions or any other grounds in the same manner as provided in the Contract Documents for like claims of the Contractor upon the Owner . . . *Some* payment of additional monies from contractor to subcontractor are contingent upon payment from owner to contractor. Subcontractor hereby expressly waives any other right to damages or additional compensation should the claim be denied by the Owner, or should Owner delay approval or disapproval of Subcontractor's claim, *as it relates to*

7

*owner claims, change orders, or extra work. All other rights to collect from the contractor remain in effect.[21]*

### 2. The BPDI Proposal governs the "pass through" CORs.

Based on the language of the Subcontract, the Court finds that the BPDI Proposal governs the pass through CORs rather than the Wu Addendum. The parties' arguments boil down to two main issues: 1) whether Paragraph 9 of the Wu Addendum is barred by the BPDI Proposal because they directly conflict, warranting parole evidence to resolve the issue and 2) more generally, whether these CORs are in fact owner claims that would be governed by Paragraph 9 of the Wu Addendum. The Court resolves both issues in favor of BPDI.

### i. To the extent that Paragraph 9 is read to be a "pay when paid" provision, it is precluded by the terms of the BPDI Proposal.

Paragraph 9 of the Wu Addendum contemplates claims under which the owner is obligated to the subcontractor. BPDI, however, argues that the provision in Paragraph 9 of the Wu Addendum that requires "some payment of additional monies from contractor to subcontractor" is contingent upon payment from owner to contractor and, thus, constitutes a "pay when paid" clause.[22] Such a provision is specifically barred by the BPDI Proposal, which states in unequivocal terms: "NO PAY WHEN PAID CLAUSES ACCEPTED."

The parties argue over the nomenclature of the so-called "pay when paid clause" found in Paragraph 9 of the Wu Addendum. After careful review of the clause, the Court finds that its label is irrelevant. The legal function of the provision

---

[21] The italicized portions were the result of a handwritten modification by BPDI's attorney, Peter Robey, upon signing the Addendum. Originally, the provision referred to "any payment of additional monies" rather than the modified "some." *See* Wu's Proposed Findings of Fact ¶ 16.

[22] Indeed Wu's President Kirby Wu acknowledged at trial his understanding of this provision as a "pay when paid" provision. *See*. Kirby Trial Tr. 5/25/2021, 107:19-108:13.

8

is to ensure that the Subcontractor's payment for certain claims is contingent on the Contractor being paid first. The secondary party doesn't get paid until the primary party is paid. Hence, it is clear that the function of Paragraph 9 is a "pay when paid" process, and thus, is barred by the language in the BPDI Proposal.

Wu contends that this creates a conflict between the two provisions, and thus the Subcontract is ambiguous. Wu argues it is proper and even, mandatory, that the Court look to extrinsic evidence to resolve the ambiguity.[23] Wu is correct that if there is an ambiguity, the Court must look beyond the language of the contract to ascertain the parties' intentions.[24] However, a contractual provision is not ambiguous merely because the parties disagree about how it is to be interpreted.[25] Ambiguity exists when a provision is "reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[26] Moreover, there is no ambiguity in a contract simply because there are conflicting provisions, when the contract itself provides a mechanism for resolving such conflicts.

Wu fails to adequately defend against the precedence provision included in the BPDI Proposal:

> "This proposal, in its entirety, shall be the basis of our agreement and shall be made an integral part of and be in corporate (sic) into any purchase order, AIA contractor/subcontractor agreement and shall take precedence should there be any conflict."

---

[23] *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).
[24] *Id.*
[25] *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992).
[26] *Id.*

This precedence provision properly addresses and overrides any conflict in the parties' agreements, including any purported "pay when paid" provision.[27] The Court thus finds that the BPDI Proposal supersedes Paragraph 9 of the Wu Addendum, to the extent the CORs in question were submitted as "pay when paid" items.

### ii. The CORs are not Owner Claims

Wu further argues that the CORs in question are owner claims that can only be paid by DPL as the owner of the property. Wu points to the qualifying language in the Wu Addendum which states ". . . as it relates to owner claims, change orders, or extra work. . ." as a basis for its position that the pass through CORs are for DPL to pay and BPDI waived its right to compensation when DPL denied the CORs. Wu claims that because DPL "owns the Project site", then all CORs pertaining to obstructions are owner claims.[28] BPDI contends that "owner claims" are changes ordered by DPL as owner, or change order requests related to conditions for which DPL is generally responsible. The phrase "owner claims" is not expressly defined within the Subcontract. However, a term in a contract is not ambiguous simply because it is not defined.[29] The true test that the Court must apply is whether "a reasonable person in the position of the parties" would conclude that these CORs would be included within the definition of "owner claims."[30] After examining the contractual language about specific responsibilities and payment provisions, the Court holds that the BPDI CORs are not owner claims.

---

[27] *Id.*

[28] Def.'s Proposed Findings of Fact and Conclusions of Law at ¶ 47.

[29] *Sassano v. CIBC World Markets Corp.,* 948 A.2d 453, fn 86 (Del. Ch. 2008).

[30] *Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 739 (Del. 2006).

The agreement between Wu and DPL ("the Prime Contract") is the first place to look for the legal responsibilities of DPL. [31] There is little in the Prime Contract which indicates that the BPDI CORs would be considered owner claims. There is one tangential connection to obstructions in Section 3.4 of the Prime Contract. It states that the Contractor will be expected to inspect the worksite before work is performed and that "no reasonably discoverable condition existing at the Site" will be justification to affect the work. But this provision does not speak to or address potential obstructions, subcontractor relations or how this would relate to a COR. [32] Meanwhile, the Subcontract – the document that governs the obligations between Wu and BPDI – does contain specific language about obstructions[33], hardened grout[34], excess grout[35] and downtime[36], all of which are the subjects of BPDI pass through CORs in question. The BPDI Proposal specifically states that obstruction removal and corrective work resulting from encountering obstructions would be subject to reimbursement. [37]

As for payment, there is no indication, in either the Prime Contract or the Subcontract, that DPL would be obligated to compensate BPDI for the CORs in question. Hence, there is no credible support to deem these CORs as "owner claims." Prime Contract Provision 23.4, titled "Contractor's Payments to Subcontractors", states that the Contractor will pay each Subcontractor "in accordance with the terms of the Subcontract" and that DPL "has no obligation to pay Subcontractors. . . or to ensure Contractor pays Subcontractors."[38] Meanwhile, Section 11 of the Subcontract

---

[31] Ex. 76 – DPL Master Terms and Conditions.
[32] *Id.*
[33] Ex. 3 - Subcontract ¶ 16 .
[34] *Id.* at ¶ 6.
[35] *Id.* at ¶ D.
[36] *Id.* at ¶ C.
[37] *Id.* at ¶ 16..
[38] Ex. 76 – Master Terms and Conditions at 47.

states that the Contractor pays Subcontractor for performance.[39] Final payment, pursuant to Provision 11.3, shall be made by the Contractor to the Subcontractor when the Subcontractor's Work is fully performed.[40]

The Court finds no reasonable basis to conclude that "owner claims" include the BPDI CORs submitted to Wu. The contractual language demonstrates that, both in specificity of terms and payment, DPL has distanced itself from the BPDI-Wu change order relationship. Article 1.5 of the Subcontract states that the agreement does not create a contractual relationship of any kind between the Owner and the Subcontractor, or "between any persons or entities other than the Contractor and Subcontractor."[41]

Wu alternatively argues that there is ambiguity in these terms, which should permit parole evidence into this analysis. The Court will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.[42] Nor will the Court "twist [or] distort" the terms of the Subcontract to incorporate the terms of the Prime Contract and a role for DPL.[43] A clear and reasonable reading of the Wu Addendum makes clear that owner claims are excised from the unqualified obligation of the contractor to pay valid claims submitted to it from its subcontractor. Only those claims that are owner claims are to be passed through to the owner for payment and if not paid by the owner, they are not the responsibility of the Contractor.[44] The Court holds that the pass through CORs are not owner claims, and

---

[39] *Id.*

[40] *Id.*

[41] Ex. 3 - Subcontract at 3.

[42] *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del.1992).

[43] *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 57 (Del. Super. 1995).

[44] Wu points to two occasions where BPDI issued change orders to Wu resulting from obstructions and downtime. *See* Def.'s Proposed Findings of Fact and Conclusions of Law at 36. Those change orders were submitted to DPL and subsequently paid. This, according to Wu,

12

thus, not subject to Paragraph 9 of the Wu Addendum. For that reason, the Court reaches the same holding whether it considers the CORs as "pay when paid" items or not: the BPDI Proposal governs these CORs.

## B. Validity of the CORs[45]

The Court must next determine whether BPDI demonstrated by a preponderance of evidence, that these CORs are valid, and warrant compensation. Wu permitted eleven CORs to be passed through to DPL, and it summarily denied twenty others. Wu conceded that it found eight of the twenty denied CORs to be valid, but denied them to offset BPDI back charges. Wu contends that the other twelve did not have merit.

### 1. "Pass Through CORs"

Wu passed through eleven of BPDI's CORs to DPL for payment, for an aggregate total value of $361,904.00.[46] Wu argues that it should not be liable for payment because of the aforementioned "pay when paid" provision, but concedes the validity of the CORs elsewhere. At trial, Wu & Associates President Kirby Wu stated that "the [CORs that] we thought had merit we passed through and the ones that we thought did not have merit we did not pass through."[47] During deposition, Kirby Wu stated, "the fact that I advanced the change orders means I believe the change orders are merited."[48] He continued, "I believe there will be monies due to

---

demonstrates that similar CORs are owner claims. The Court finds that argument unavailing. The fact that DPL decided to pay a COR passed through by Wu on two occasions and deny it on other occasions is not germane to a holistic reading of the Subcontract that places the obligation for payment for specifically delineated CORs squarely on Wu.

[45] *See* Appendix A for a summary of the challenged CORs.

[46] BPDI originally asserted that the aggregate value of these CORs was $364,213.00. After careful review, the Court notes that BPDI miscalculated its values for three CORs. *See* Appendix A.

[47] Wu Trial Tr., 5/25/2021, 123: 3-8.

[48] Ex. 106 – Deposition Testimony of Wu Rule 30(b)(6) Witness Kirby Wu at p. 23 (120: 8-12).

BPDI with respect to some or all of these change orders that Wu has submitted as a claim. And if we are successful with those, then there will be monies due to BPDI. . . .I believed it was wrong to deny all of these change orders to BPDI."[49]

Indeed, Wu had consolidated these CORs and converted them into their own CORs with a markup for profit and overhead.[50] For example, BPDI COR 2 was submitted to Wu for $7,946.00 for downtime due to hitting an obstruction.[51] Wu proceeded to submit this claim to DPL, relabeled as WU COR 9. The new COR added an overhead for 10%, a profit of 5%, an insurance cost and a bond cost, all for a total of $9,357.00. Nowhere in the revised COR did Wu contest the merit of BPDI's claim.[52]

The Court has previously found that the BPDI Proposal is controlling and negates any "pay when paid" provision cited by Wu. Any other argument is without merit as Wu has already conceded the validity of these eleven pass through CORs. For that reason, Wu is liable for the cost in the aggregate amount of $361,904.00.

### 2. "Non-Pass Through" CORs In Dispute

Wu specifically disputes the merits of twelve BPDI CORs.

---

[49] *Id.* at 24 (151: 7-9).

[50] Trial Ex. 15, 17, 19, 21, 24, 26, 28, 30, 32.

[51] Ex. 15.

[52] In its post-trial brief, however, Wu takes the position that the "pass through" CORs, most of which dealt with auger refusal from alleged subsurface obstructions, were not substantiated at trial. After review of the record, the Court finds ample evidence to support BPDI's burden of establishing that BPDI hit obstructions leading to auger failure and resulting downtime. *See, e.g.* Ex. 15, 78-79, 85-90.

### a. COR 34

BPDI seeks $6,944.00 for lost production and downtime due to obstructions at five different piles.[53]

Wu argues that BPDI has not met its burden of proof to demonstrate that obstructions existed. Wu claims that BPDI was unable to drill because of its means and methods. Wu emphasizes that Berkel, the subcontractor that took over after BPDI was terminated, did not encounter the same issues because of what Wu perceived as Berkel's proper means and methods.

The record is replete with evidence that BPDI encountered numerous obstructions that led to its inability to drill. BPDI relies on expert testimony from Aver Technologies President, Swamy Avasarala and Pennoni Geotechnical Divisional Manager, Theodore Thomson to substantiate its claim of obstructions. Wu retained Pennoni Associates in December 2018 to review relevant project documentations, including plans, geotechnical reports, and to provide an opinion as to whether the construction was proceeding as intended.[54] In addition, BPDI retained Aver Technologies in 2018 to use and collect data, and provide recommendations regarding the auger cast grout piles.[55] Wu argues that neither of these experts witnessed BPDI's work, that they only parroted BPDI's findings, and that their conclusions are speculative. The Court disagrees.

While it is true that neither were on site on the day when an auger reportedly hit an obstruction, both teams did observe the site after the fact. Both Pennoni and Avasarala examined the machinery that was used and concluded that the proper

---

[53] Ex. 6 (Piles 109, 83, 81, 2 & 52.)
[54] Thomson Trial Tr., 5/25/2021, 13:1-22.
[55] Avasarala Trial Tr., 5/26/2021, 184:11-18.

means and methods were used by BPDI.[56] As for the allegation of parroting BPDI's findings, both experts made their own individual findings. Rather than parrot BPDI language, Thomson sent an email directly after visiting the work site: "My biggest takeaway from the work performed to date, is that obstructions are causing a big problem."[57] Avasarala found that BPDI was able to drill in other areas of the plot successfully, but not in the areas where the augers weren't able to rotate, and inevitably got stuck.[58] He concluded that it was likely that the obstructions were hit before the auger reached Strata B or C.[59] Also, BPDI President David Lawrence testified that when he was on the Project site, he personally heard BPDI's drilling rig hit an underground obstruction. He stated, "You can literally see where it hit so much torque it moved the crane."[60] He also witnessed various forms of obstructions at the site.[61] In addition, a Pennoni report from February 8, 2019, the day that BPDI reportedly hit an obstruction, states that there was auger grinding and chatter, and wood debris present.[62]

For these reasons, the Court finds that Plaintiff has met its burden of proof that BPDI encountered obstructions while drilling. As previously mentioned, in the BPDI Proposal Paragraph 16, under Exclusions, costs related to obstructions shall be reimbursed. The Court finds that Wu is liable for the $6,944.00 set forth in COR 34 in accordance with the obstructions.

---

[56] Ex. 40.
[57] Ex. 43.
[58] Avasarala Trial Tr., 5/26/2021, 201:10 – 202:2.
[59] *Id*. at 208: 3:12.
[60] Lawrence Trial Tr., 5/24/2021, 84:5-14.
[61] *Id.* at 85:15-87:7, 90:1-96:3.
[62] Ex. 70 – Pennoni Daily Field Report 2-8-2019.

### b. COR 39R

BPDI seeks $11,773.00 for downtime to break down equipment in February. BPDI alleges that this was the result of unforeseen conditions and underground obstructions while drilling.[63] Wu Project Manager Donald Stauffer emailed BPDI that the COR was not merited because DPL had previously terminated BPDI, and thus, this COR would convert to project demobilization costs. Wu argues that demobilization from the project should be covered by the base contract lump sum price.[64]

Notably, BPDI's COR 39 submission specifically references costs for breakdown of equipment which should be categorized under demobilization costs as opposed to "downtime costs." Demobilization from the Project was part of the fixed price proposed which is a risk to be borne by BPDI and not properly recast as "downtime costs."[65] For that reason, Wu is not liable for the $11,773.00 set forth in COR 39R.

### c. COR 41

BPDI seeks $12,500.00 for unabsorbed costs of demobilization. BPDI argues that when Wu, upon DPL's direction, reduced BPDI's scope of work from 140 piles to 60 piles, BPDI had no means for billing for its demobilization costs and no ability to absorb those costs through its billing for the original scope of 140 piles.[66] Again, the Court holds that demobilization was part of the fixed price proposed by BPDI and not to be separately billed. BPDI bore the risk of non-payment for any such costs. For that reason, Wu is not liable for the $12,500.00 set forth in COR 41.

---

[63] Pl.'s Post-Trial Brief at 6.
[64] Stauffer Trial Tr. 5/26/2021, at 7:1-11.
[65] Ex. 3, BPDI Proposal at 5.
[66] Ex. 83.

17

### d. COR 13, 15, 16, 17

BPDI seeks $12,964.00 for extra costs incurred by BPDI due to Wu's Engineer on site, Tetra Tech's, direction to keep drilling beyond auger refusal rates. BPDI argues that despite the BPDI Proposal expressly defining the auger refusal rate for work, Tetra Tech directed the drilling operator to keep drilling on a hole even though the refusal rate had been hit. BPDI's compliance caused additional damage to equipment, resulting in additional costs.

BPDI claims that it had no choice but to listen to a Tetra Tech representative order. Wu Project Manager Donald Stauffer testified that BPDI was not expected to blindly follow Tetra Tech direction while on site.[67] Tetra Tech Engineering Manager Ralph Boedeker testified that Tetra Tech had no such authority over BPDI on site.[68] BPDI is correct that the Wu Addendum states that if the Subcontractor disregarded the authority of Owner's Representative then it would be grounds for default.[69] The record demonstrates that such authority did not extend to directing the drilling by a BPDI drilling operator or the means and methods by which BPDI conducted its drilling work on the Project.[70] BPDI has not provided sufficient counter-evidence demonstrating the exact authority that Tetra Tech imposed on it in those instances or that it was left without a valid alternative to stop drilling and seek further guidance. BPDI has not met its burden of establishing by a preponderance of evidence that Tetra Tech is responsible for allegedly directing BPDI to surpass its auger refusal rate. For that reason, Wu is not liable for the $12,964.00 that comprises COR 13, 15, 16, and 17.

---

[67] Stauffer Trial Tr. 5/26/2021 at 16:2-6.
[68] Boedeker Trial Tr. 5/26/2021 at 83-84.
[69] Ex. 3, Wu Addendum at 7.
[70] Boedeker Trial Tr. 05/26/2021 83:7-22.

### e. COR 30, 31, 32 & 33 – Claims never Received

BPDI seeks (1) $25,195.00 for COR 31 & 32 for extra costs incurred due to a lack of water, (2) $16,745.00 for COR 33 for lost time, tooling, and a rebuild due to water tank issues, and (3) $1,970,00 for COR 30 for downtime costs to crew and equipment waiting on survey and layout. BPDI claims that the Subcontract mandated Wu to supply BPDI with a daily source of water, which was excluded from the scope of work. The water truck then froze on several occasions, which stopped operations, and created issues.

Wu claims that BPDI failed to submit these four CORs for review. Stauffer, Wu's representative, testified that he saw these CORs for the first-time during discovery.[71] During trial, BPDI's counsel pointed to the fact that the CORs were affixed with an "R" in the log sheet once they were revised, which indicates that someone at Wu looked at them. As the sole basis for demonstrating receipt by Wu, the Court is not persuaded by this fact. There was no testimony or other evidence of which entity added the "R" to the CORs. The evidence in the record fails to demonstrate that Wu received these CORs prior to litigation.

Accordingly, BPDI has not met its burden of proof to demonstrate that Wu received these CORs. For this reason, Wu is not liable for CORs 30, 31, 32 and 33.

### f. COR 18

BPDI seeks $1,477.00 for extra costs due to Wu's failure to provide survey and layout in a timely manner. BPDI specifically claims that these costs were for crew down time and the loss of eight yards of grout. Wu claims that it rejected COR 18 due to BPDI's own mismanagement and error. Stauffer, Wu's representative, testified at trial that it was not Wu's responsibility to order the grout for the Project.

---

[71] Stauffer Trial Tr. 5/26/2021, 68:4-8.

The BPDI foreman had communicated to Wu that only seven piles were necessary to establish layout for that particular day. When more grout arrived on scene than what was necessary for that day, BPDI demanded that Wu provide additional layout so that BPDI could begin drilling additional piles. Wu contends that because it had not received prior notice of the need for additional layout, it could not accommodate this request. BPDI has not provided any evidence that Wu is responsible for this other than the blanket statement that Wu is responsible for providing survey and layout in a timely manner.[72] The Court finds that BPDI has failed to meet its burden that Wu is liable for this $1,477.00 for the additional grout and layout necessary as claimed in COR 18.

### 3. Non-Pass Through CORs due to Back Charges

Wu does not dispute BPDI's entitlement to payment of non-pass through CORs 11R, 12R, 14R, 19R, 35R, 36R, 37R, and 43R. Instead, Wu claims that the CORs are valid but weren't paid in order to offset back charges. These CORs covered issues concerning lack of water, lack of survey and layout, auger refusal, excessive drilling, time, and material for excavation work.

Wu filed a counterclaim in which it contends that BPDI owes it back charges due to BPDI's failure to timely complete its work. Wu claims that BPDI breached the contract when DPL terminated it from the contract, thus not completing performance and leaving Wu "significantly damaged" to the amount of $41,766.81.[73] Wu points to Section 5.11 of the Prime Contract to support its claim that Wu is entitled to set off any and all present and future indebtedness of BPDI to Wu. This provision states that DPL "may set setoff against any amount payable

---

[72] Def.'s Proposed Findings of Fact and Conclusions of Law ¶ 115.
[73] *Id.* at p. 15, fn 1.

under a Purchase Order any and all present and future indebtedness" of the contractor to DPL. The provision only speaks to Wu's liability to DPL and not that of BPDI.

Wu contends that it had budgeted $25,784.31 for various costs during BPDI's twenty days of pile installation. Wu argues that "as a direct result of BPDI's failed means and methods, and the delays resulting there from", Wu incurred an additional $41,766.81 in costs. However, on this counterclaim, Wu has the burden of proof to demonstrate that BPDI's failure to perform was because of its means and methods. The Court finds that there is evidence in the record to support that BPDI used appropriate means and methods for this Project. BPDI's drilling equipment was approved in advance by Tetra Tech and Pennoni.[74] Its workers were pooled from the same union as Berkel, the company which Wu then praised for its means and methods in taking over the project. There is no evidence of improper equipment or unskilled laborers. Thus, Wu's counterclaim, for the alleged back charges owed, fails. For that reason, Wu is liable for these eight CORs which it has already conceded were valid. Wu is liable for the aggregate value of the eight CORs, which amount to $20,359.50.

### 4. Wu's Claim Against Selective

Wu also filed a claim against BPDI's bonding company, Selective, finding it is jointly and severally liable with BPDI for the costs attributable to BPDI's failure to complete its work. Because the Court has not found BPDI liable for these costs, Selective is also not liable.

---

[74] Ex.4 - BPDI Equipment Submittal; Ex. 40 – Pennoni December 14, 2018 letter report to Wu.

21

### 5. Delaware Building Construction Payments Act

BPDI and Wu both claim that they are entitled to attorneys' fees under the Delaware Building Construction Payments Act (the "Payment Act").[75] BPDI claims that Wu is liable because it has not paid all of the amounts due under BPDI's payment applications, and has not demonstrated a reasonable cause for withholding the payments due.[76] Wu claims that its nonpayment of the CORs was a result of DPL's denial, or a lack of merit. Wu argues that BPDI's claim was frivolous and in bad faith, and for that reason, BPDI should be responsible for attorneys' fees.[77]

---

[75] 6 *Del. C*. § 3501 et seq..

[76] Pl.'s Post Trial Brief at 32-33; *See* 6 *Del. C.* §3506(e);

[77] The Court will reserve ruling on the parties' request for attorneys' fees pursuant to 6 *Del. C.* §3506 et seq. and request supplemental submissions from the parties consistent with this Opinion and Order.

## V.    CONCLUSION

For the reasons set forth above, the Court finds Wu liable for the CORs previously mentioned together with pre- and post-judgment interest at the legal rate.[78] The parties shall schedule a conference with the Court to establish a briefing schedule on the requests for attorneys' fees. **IT IS SO ORDERED,** this 1st day of December, 2021.

_____
Sheldon K. Rennie, Judge

---

[78] *Brandywine Smyrna, Inc. v. Millennium Builders*, LLC, 34 A.3d 482, 486 (Del. 2011) ("[I]n addition to the principle that prejudgment interest in Delaware cases is awarded as a matter of right, the general rule is that "interest accumulates from the date payment was due the plaintiff, because full compensation requires an allowance for the detention of the compensation awarded and interest is used as a basis for measuring that allowance." (internal quotation marks omitted)); *see also Chaplake Holdings Ltd. V. Chrysler Corp.*, 2003 WL 22853462, at *4 (Del. Super. Ct. Oct. 30, 2003) ("Under Delaware law, pre-judgment and post-judgment interest on a debt is awarded as a matter of right and not of judicial discretion. Courts award pre-judgment and post-judgment interest to the prevailing injured party for the detention of damages." (internal quotation marks and citation omitted)).

**APPENDIX A.**

| Category 1: Wu Pass throughs to DPL (Total: $361,904.00) | | | | |
|---|---|---|---|---|
| **Date** | **COR #** | **Exhibit** | **Amount** | **Description** |
| 11/15/2018 | 2R (Wu #9) | 14 | $7,946.00 (Wu pass through $9,357.06) | Downtime due to hitting obstruction (auger refusal) in Reaction Pile 6. |
| 11/30/2018 | 4R (Wu #10) | 16 | $53,970.00 (Wu pass through $66,505.50) | Equipment and downtime due to hitting obstruction (auger refusal) in Pile 8. |
| 2/11/2019 | 5R (Wu # 11) | 18 | $99,360.00 (Wu pass through at $122,866.00) | Downtime and equipment (auger refusal) at Pile 132 |
| 1/29/2019 | 21R (Wu #22) | 20 | $4,673.00 ($5,278.62 for Wu pass through) | Downtime and loss of grout at Pile 111. |
| 2/8/2019 | 26R & 27 (Wu #21) | 22 & 23 | $9,433.00[79] for 26R + $71,750.00 for 27 | Downtime and lost tooling at Pile 106. |

[79] In COR #26R, as listed in its Demonstrative Trial Exhibit "A", BPDI requests $11,806.00. However, in the COR itself and Change Order Log, COR #26R lists an amount of $9,433.00. *See* Ex. 22, 38. Without further proof, the Court will utilize the $9,433.00 listed in the COR for its calculation.

| | | | ($102,798.73 for Wu pass through) | |
|---|---|---|---|---|
| 2/13/2019 | 38 (Wu #24) | 25 | $57,609.00 (Wu pass through for $70,370) | Downtime costs for work stoppage (excavation) at Pile 106. |
| 3/1/2019 | 7R (Wu #16) | 53 | $2,963.00 ( Wu pass through at $3,479.52) | Costs to re-set, ream and complete a new Pile 132. |
| 3/2/2019 | 40R (Wu COR #25) | 27 | $32,554.00[80] (Wu pass through at $37, 787.00) | Downtime for idle equipment. |
| 4/8/2019 | 42R (Wu COR #26) | 29 | $13,486.00 ($16, 681 for Wu pass through) | Grout overages billed per unit cost in Subcontract. |
| 4/17/2019 | 45R (Wu | 31 | $8,160.00[81] ($11,040.00 | Time and materials to infill pile caps. |

[80] In COR #40R, as listed in its Demonstrative Trial Exhibit "A", BPDI requests $32,544.00. However, in the COR itself and Change Order Log, COR #40R lists an amount of $32,554.00. *See* Ex. 27, 38. Without further proof, the Court will utilize the $32,554.00 listed in the COR for its calculation.

[81] In COR #45R, as listed in its Demonstrative Trial Exhibit "A", BPDI requests $8,106.00. However, in the COR itself and Change Order Log, COR #45R lists an amount of $8,160.00. *See*

| | COR #29) | | for Wu pass through) | |
|---|---|---|---|---|
| **Category 2 – Payment denied due to set off costs  (Total:$20,359.50)** | | | | |
| 3/14/2019 | 11 | 34 | $3,010.00 | Extra costs due to a lack of water |
| 3/14/2019 | 14 | 34 | $1,447.50 | Extra costs due to a lack of water |
| 3/14/2019 | 12 | 36 | $1,970.00 | Extra costs due to failure to provide survey and layout in a timely manner |
| 3/1/2019 | 19 | 170 | $894.00 | Excavation work performed at Wu's request on time and material basis |
| 4/8/2019 | 35R | 171 | $1,565.00 | Excavation work performed at Wu's request on time and material basis |
| 3/2/2019 | 36 | 172 | $7,082.00 | Excavation work performed at Wu's request on time and material basis |
| 3/2/2019 | 37 | 173 | $3,198.00 | Excavation work performed at Wu's request on time and material basis |

---

Ex. 31, 38. Without further proof, the Court will utilize the $8,160.00 listed in the COR for its calculation.

| | | | | |
|---|---|---|---|---|
| 3/18/2019 | 43 | 176 | $1,193.00 | Excavation work performed at Wu's request on time and material basis |
| **Category 3 – Payment denied on the merits (Total: $89,568.00)** | | | | |
| 3/2/2019 | 34 | 6 | $6,944.00 | Lost production/downtime due to obstruction at Piles 109, 83, 81, 2 & 52. |
| 3/2/2019 | 39R | 174 | $11,773.00 | Downtime to break down equipment in February. |
| 3/15/2019 | 41 | 83 | $12,500.00 | Unabsorbed costs of demobilization. |
| 1/30/2019 | 13, 15, 16 & 17 | 33 | $12,964.00 | Extra costs incurred by BPDI due to Tetra Tech's direction to keep drilling beyond auger refusal rate. |
| 1/29/19 - 3/14/19 | 31, 32 | 34 | $25,195.00 | Extra costs due to a lack of water |
| 3/14/2019 | 33 | 37 | $16,745.00 | Lost time, tooling, and rebuild due to water tank issues. |
| 1/14-3/14/19 | 18R, 30R | 36 | $3,447.00 | Extra costs due to failure to provide survey and layout in a timely manner |